298 S.E.2d 781

**Mary Jane COOPER, Tahlia Bell, Twila Harris, Faye Hickman, Joann Scales, Patricia Jackson, Darleen Johnson, Sherry Mead, Connie Ray and Kathryn Fencil**

v.

**Philip J. GWINN, Warden, West Virginia State Prison For Women at Pence Springs; and W. Joseph McCoy, Commissioner, West Virginia Department of Corrections.**

**Case No. 15153.**

Supreme Court of Appeals of West Virginia.

Dec. 18, 1981.

Concurring Dec. 18, 1981.

Concurring Sept. 3, 1982.

Miller, C.J. and Neely, J., concurred and filed opinions.

Daniel F. Hedges, Charleston, for petitioners.

Penelope Crandall, Crandall, Pyles, Crandall & Poyourow, Charleston, for amicus curiae (WV NOW)

Chauncey H. Browning, Atty. Gen., David P. Cleek, Deputy Atty. Gen., Gray Silver, III, Asst. Atty. Gen., Charleston, for respondents.

McGRAW, Justice:

This is an original proceeding in mandamus. The petitioners are inmates at the West Virginia State Prison for Women at Pence Springs. The respondents are Philip J. Gwinn, Warden of the State Prison for Women, and W. Joseph McCoy, Commissioner of the Department of Corrections. The petitioners seek a writ of mandamus to compel the respondents to provide them with meaningful educational and rehabilitative programs and to permit them daily exercise, as mandated by W.Va.Code §§ 62–13–1 and 62–13–4 (Cum.Sup.1980).

As we read the law the Legislature has passed, we are lead to the unavoidable conclusion that by virtue of the constitutional guarantee of due process, the inmates of the women's penitentiary, as well as other classes of citizens, are entitled to the benefit of law which the Legislature has enacted. We will begin our scrutiny of the issues presented in this case by exploring the theoretical rationale underlying the petitioners' claim to the benefit of law in relation to the purpose and function of our system of government and the constitutional guarantee of due process of law.

I

We, as justices, upon taking office, are required to make oath or affirmation that we will support the Constitution of the United States and the Constitution of this State, and that we will faithfully discharge the duties of this office to the best of our skill and judgment. W.Va. Const. art. 4, § 5. We are admonished by the Constitution we have sworn to uphold that "[f]ree government and the blessings of liberty can be preserved to any people only by a firm adherence to justice ... and by a frequent recurrence to fundamental principles." W.Va. Const. art. 3, § 20.

The fundamental principles which must guide us in the interpretation of the law are those principles embodied in the documents constituting the organic law, i.e. the Constitution of the United States, and the Constitution of the State of West Virginia. First and foremost among the documents constituting the organic law of this jurisdiction is the Constitution of the United States, for as we are informed by the State Constitution: "The State of West Virginia is, and shall remain, one of the United States of America. The Constitution of the United States of America, and the laws and treaties made in pursuance thereof, shall be the supreme law of the land." W.Va. Const. art. 1, § 1.

The government of the United States is a government of enumerated powers and all powers not delegated to it by the Constitution, nor prohibited by the Constitution to

the States, are reserved to the States or the people thereof. U.S. Const. amend. X; W.Va. Const. art. 1, § 2. Among the powers so reserved to the states is the exclusive regulation of their own internal government and police; and it is the high and solemn duty of the several departments of government created by the State Constitution to guard and protect the people of this State from all encroachments upon the rights so reserved. W.Va. Const. arts. 1, 2.

The power of the State to exclusively regulate its own internal government and police, however, is subject to the Guaranty Clause of the United States Constitution, which provides: "The United States shall guarantee to every State in this Union a Republican Form of Government . . . ." U.S. Const. art. IV, § 4. The classical American form of republican government was adopted by the people of West Virginia in the State Constitution. But before that specification of form the people reserved to themselves certain powers. For example, article 2, section 2 of the West Virginia Constitution provides that "[t]he powers of government reside in all the citizens of the State, and can be rightfully exercised only in accordance with their will and appointment." Article 2, section 4 of the West Virginia Constitution provides that "[e]very citizen shall be entitled to equal representation in the government . . . ." Article 3, section 2 of the West Virginia Constitution provides that "[a]ll power is vested in, and consequently derived from, the people. Magistrates are their trustees and servants, and at all times amenable to them." Article 3, section 3 of the West Virginia Constitution provides that:

> Government is instituted for the common benefit protection and security of the people, nation or community. Of all its various forms that is the best, which is capable of producing the greatest degree of happiness and safety, and is most effectually secured against the danger of maladministration; and when any government shall be found inadequate or contrary to these purposes, a majority of the community has an indubitable, inalienable, and indefeasible right to reform, alter or abolish it in such manner as shall be judged most conducive to the public weal.

Finally, the people also provided in the State Constitution that "[n]o person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers." W.Va. Const. art. 3, § 10.

After reserving to themselves specific rights of which the foregoing are examples, the people then proceeded to create the republican form of government as contemplated by the Constitution of the United States. Through the State Constitution the people provided that "[t]he legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others; nor shall any person exercise the powers of more than one of them at the same time . . . ." W.Va. Const. art. 5, § 1.

The legislative branch of government is the first of these three departments dealt with by the State Constitution. The legislative powers are vested in a senate and house of delegates, which are given detailed instructions in article 6 of the State Constitution respecting the procedures by which laws may be enacted. These article 6 procedures are the law of the land and the Legislature is bound by its oath to follow that law. W.Va. Const. art. 6, § 16. These constitutional provisions respecting mandatory legislative procedures can therefore properly be deemed a form of procedural due process. The culmination of these procedures results in law, law being a public policy statement of the people acting through their legislature in the republican form of government.

Having thus created a legal devise by which public policy could be addressed and law established, the people, acting through the State Constitution, next created the executive department, see W.Va. Const. art. 7, § 1, and vested in the Governor the chief executive power and the duty to "take care that the laws be faithfully executed." W.Va. Const. art. 7, § 5. Should the Governor fail to take care that the laws

be faithfully executed, or refuse to expedite the will of the people as expressed through their Legislature, redress is afforded by application to the judiciary, the third branch of the republican form of government created by the people in the State Constitution and guaranteed by the Constitution of the United States.

The people, wisely anticipating that men are not angels and knowing the mischief and injustice that can result from unequal application of the law, or from the failure of government to follow the law of the land, provided in their organic law that "[t]he courts of this State shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay." W.Va. Const. art. 3, § 17. And this judicial power the people vested "solely in a supreme court of appeals and in the circuit courts, and in such intermediate appellate and magistrate courts as shall be hereafter established by the legislature, and in the justices, judges and magistrates of such courts." W.Va. Const. art. 8, § 1.

It is thus the duty of courts to administer justice consistent with the organic law created by the people. It is in the performance of this duty that we are of necessity called upon to interpret the meaning of the law enacted by the Legislature in order to insure that justice is done and the benefits of law are bestowed upon the people as intended by the Legislature.

In summary, statutory law is the public policy statement of the people acting through the legislative branch of the republican form of government. By the terms of our organic law the people are entitled to the benefit of law enacted by their legislative representatives. The responsibility to see that the law enacted by the people is enforced rests primarily upon the executive department. When, however, the executive department fails to expedite the will of the people as expressed by the Legislature, the people may petition the courts by way of extraordinary proceedings such as mandamus, used here to require the executive branch to comply with the law enacted by the Legislature. In this sense our republican form of government embodies concepts of procedural and substantive due process which guarantee that the people receive the benefit of law as enacted by their Legislature.

It is often said that we in America live in a land where we have a government of laws and not of men. What is commonly meant by this phrase is that we live by rule of law—a concept of utmost importance, but having no defined nor readily definable content. The concept of a system governed by rule of law implies the subordination of all authorities, be they legislative, executive, or judicial, to certain principles which would generally be accepted as characteristic of law. These principles include the fundamental concepts of justice, morality and fairness. *See, Moore v. Starcher,* 167 W.Va. 848, 280 S.E.2d 693, 696 (1981); D. Walker, *The Oxford Companion to Law,* at 1093 (Clarendon Press, Oxford 1980).

In any legal system, the concept of rule of law further implies limitations on legislative power, safe-guards against abuse of executive power, proper protection of individual rights and liberties, equality before the law, and due process. Government by rule of law means more than that government has the duty to maintain law and order; it also means that the government itself is subject to rules of law, and cannot disregard the law, or remake it to suit itself without heeding those procedures specified by law. *See,* D. Walker, *The Oxford Companion to Law, supra.*

Due process of law refers to the law of the land which derives its authority from the inherent and reserved powers of the State exerted within the limits of those fundamental principles of liberty and justice which lie at the basis of all our civil and political institutions, and implies conformity with natural and inherent principles of justice. *Poindexter v. Willis,* 23 Ohio Misc. 199, 256 N.E.2d 254 (Ct. of Com.Pl.1970); *see also Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *Holden v. Hardy,* 169 U.S. 366, 18

S.Ct. 383, 42 L.Ed. 780 (1898); *Ditty v. Hampton,* 490 S.W.2d 772 (Ky.1973).

[3, 4] Thus, if due process of law has any meaning it is that there is no sovereign unless he conforms to the principles of legality. R. Mott, *Due Process of Law,* at 589 (2d. ed. 1973). Accordingly, it is important to remember that the constitutional guarantee of due process is primarily a guarantee of legality itself—legality not of the formal or superficial kind, but of the fundamental inherent legality which is based upon tested principles of constitutional government. *Id.* at 604. It is against this framework of legality that the claims of the petitioners must be tested.

## II

[5] Before this court may properly issue a writ of mandamus in response to the petitioners' claims, three elements must coexist: (1) the existence of a clear right in the petitioners to the relief sought; (2) the existence of a legal duty on the part of the respondents to do the thing the petitioners seek to compel; and (3) the absence of another adequate remedy at law. *Delardas v. County Court,* 158 W.Va. 1027, 217 S.E.2d 75 (1975); *Russell Transfer, Inc. v. Moore,* 158 W.Va. 534, 212 S.E.2d 433 (1975); *State ex rel. Damron v. Ferrell,* 149 W.Va. 773, 143 S.E.2d 469 (1965). We are therefore presented with three basic issues by this petition: (A) whether the petitioners have a constitutional or statutory right to rehabilitation; (B) whether the respondents have a legal duty to provide rehabilitative services that they have failed to fulfill; and (C) whether the petitioners have another adequate remedy at law.

## A

The petitioners assert that they have a right to rehabilitation by virtue of the substantive due process mandate of article 3, section 10 of the West Virginia Constitution, which provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law...."

Essentially, the petitioners appear to be saying that they have a constitutional right to the benefit of the rules of law which constitute the body of authority through which the legitimate will of the people proceeds. There are two different bodies of law which justify the petitioners' position. First, as we have already discussed, the republican form of government which exists under the West Virginia Constitution, by its nature encompasses a concept of substantive due process which insures that the people receive the benefit of the laws enacted by the Legislature.

The right to the benefit of law is one of the fundamental rights bestowed upon the people by the Constitution. The State Constitution creates a republican form of government through which the people express their consensus of what public policy should be. Through this legislative due process the public consensus becomes a rule of law. Once a rule of law has been adopted, all of those classes of people who benefit from the substance of that rule are entitled to have those public officials who are charged with administering the law, administer it for their benefit. This is a primary guaranty of due process.

[6] The West Virginia Constitution provides that when the State seeks to deprive any person of life, liberty or property, due process of law must be applied, W.Va. Const. art. 3, § 10. The more substantial the deprivation inflicted by the State, the more responsible is the government to insure operative due process as the deprivation continues. The petitioners have been imprisoned. This is the greatest deprivation of liberty which the State can lawfully inflict, and all actions of the State with respect to deprivations of this magnitude are subject to strict scrutiny.

[7] It is well established that convicted prisoners do not forfeit the fundamental protections of the Constitution by reason of their conviction and confinement. *See Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532; 49 L.Ed.2d 451 (1976); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41

252

L.Ed.2d 495 (1974). The petitioners are therefore clearly entitled to enforce their fundamental right to the benefit of law as guaranteed by the West Virginia Constitution.

The public policy statement of the people, or rule of law, with which we are concerned in this proceeding is contained in W.Va.Code §§ 62–13–1, and 62–13–4. Article 13 of Chapter 62 of the West Virginia Code establishes the Department of Corrections Management. In W.Va.Code § 62–13–1 the Legislature instructs:

> This article shall be ... construed to the end that persons committed to institutions of the State for crime or delinquency shall be afforded individual and group treatment to reestablish their ability to live peaceably and, consistent with the protection of the community, to release such individuals at the earliest possible date, and to establish a just, humane and efficient program, and to avoid duplication and waste of effort and money on the part of public and private agencies.

W.Va.Code § 62–13–4 provides, in pertinent part:

> To accomplish the purposes of this article, the commissioner (or the director of corrections management if one is appointed) shall:
>
> \* \* \* \* \* \*
>
> f. Establish a system of classification of inmates, through a reception and examination procedure, and in each institution a classification committee and procedure for assignment of inmates within the programs of the institution;
>
> g. Establish, maintain and direct a varied program of education for inmates in all institutions within the department;
>
> h. Supervise the treatment, custody and discipline of all inmates and the maintenance of the institutions and their industries;

Thus we see that the people, acting through their republican form of government, have enacted a rule of law which says that West Virginia penal institutions shall provide programs for the classification, education, and treatment of inmates. Consequently, the people incarcerated in the penitentiary, like all other citizens, have a constitutional right, guaranteed by due process as it operates through the republican form of government, to enjoy the benefit of this legislatively enacted rule of law.

The second body of law which justifies the petitioners' claims has grown around the substantive due process mandate contained in Article 3, section 10 of the West Virginia Constitution. We held in *State ex rel. Harris v. Calendine,* 160 W.Va. 172, 233 S.E.2d 318 (1977), that the concept of substantive due process is inherent in the due process clause of the State Constitution, and that "[i]n order for a statutory scheme ... to withstand constitutional scrutiny under the substantive due process standard, it must appear that the means chosen by the Legislature to achieve a proper legislative purpose bear a rational relationship to that purpose and are not arbitrary and discriminatory." 160 W.Va. at 179, 233 S.E.2d at 324. Citing this language from *Harris,* the petitioners argue that incarceration in the West Virginia State Prison for Women at Pence Springs does not bear a rational relationship to the rehabilitative purpose of confinement where the prison administration denies inmates meaningful programs of education and treatment.

It is evident from the provisions of W.Va.Code §§ 62–13–1 and 62–13–4 that the Legislature requires rehabilitation to be the primary goal of the West Virginia corrections system. It is also evident that the rehabilitative goal embodied in these statutes is designed to benefit the class of which the petitioners are members.[1] Inher-

1. Actually, the petitioners have standing in this matter because they are one of several classes who would benefit from the enforcement of this law. First, the community at large, in whose name crimes are prosecuted, are entitled to the benefit of this law, for were it not enforced the community would be faced with a state of af-fairs in which people convicted of crimes are deprived of their liberty and placed in the custody of the State for failure to adhere to the rule of law, yet those persons employed by the State who are charged with administering the law which provides for the rehabilitation of inmates

ent in the guarantee of due process contained in the West Virginia Constitution is the concept that "the law must actually make good in securing the object for which it has ostensibly been enacted." *See* R. Mott, *Due Process of Law*, at 597 (2d ed. 1973). Thus those people who are entitled to the benefit of law are entitled to invoke their constitutional right to due process in order to enforce their right to the law's benefits. Therefore, we hold that inmates incarcerated in West Virginia state prisons have a right to rehabilitation established by W.Va.Code §§ 62–13–1 and 62–13–4 and enforceable through the substantive due process mandate of article 3, section 10 of the West Virginia Constitution.

### B

Having determined that the petitioners possess a right to rehabilitation, we must next consider the duty of the respondents with regard to that right. Respondent W. Joseph McCoy is the Commissioner of Corrections for the State of West Virginia. Pursuant to W.Va.Code § 25–1–3 (1980 Replacement Vol.), he is directed to manage, direct, control and govern the West Virginia State Prison for Women at Pence Springs. Respondent Philip J. Gwinn is the Warden/Superintendent of the prison. Pursuant to W.Va.Code § 28–5C–3 (1980 Replacement Vol.), he is designated as the chief executive officer of the West Virginia State Prison for Women.

 The responsibility of all public officials is to execute their duties as the Legislature, through law, instructs. As an officer of the Department of Corrections, the Commissioner is bound by the statutes

creating that agency of state government. Furthermore, as an executive officer the Commissioner has the constitutional duty to "take care that the laws be faithfully executed." W.Va.Const. art. 7, § 5. Our Constitution does not permit executive officers to pick and choose the laws they will or will not execute, for if such were the case, the executive department could, either by commission or omission, model a system of law different than that specified by the people acting through the Legislature. So long as a legislative enactment as law exists, the executive department has the constitutional duty to attend to its faithful execution. Thus, the Commissioner of Corrections has the duty to faithfully administer the State Prison for Women "to the end that persons committed to institutions of the State for crime and delinquency shall be afforded individual and group treatment to reestablish their ability to leave peaceably ....." W.Va.Code § 62–13–1. Moreover, in order to accomplish the stated legislative purpose, W.Va. Code § 62–13–4 provides that the Commissioner of Corrections *"shall ....* [e]stablish a system of classification of inmates ... for assignment ... within the programs of the institutions ..... [e]stablish, maintain and direct a varied program of education for inmates ... [and] [s]upervise the treatment ... of all inmates ....." (emphasis added). It is well established that the word "shall", in the absence of language in the statute showing a contrary intent on the part of the Legislature, should be afforded a mandatory connotation. *See Woodring v. Whyte*, 161 W.Va. 262, 242 S.E.2d 238 (1978); *Terry v. Sencindiver*, 153 W.Va. 651, 171 S.E.2d 480

---

incarcerated by the State, are not held to the same standard of obedience to the rule of law.

A narrower class entitled to the benefit of this statute is that class of citizens who have been victimized by a criminal actor. Those citizens by statute are entitled to expect that convicted criminals incarcerated by the State are being treated by the community to the end that their criminal propensities will be subdued. A penal system characterized by retribution or revenge, rather than rehabilitation, can but result in embittered former criminals returning to society again to wreak rapacious acts upon the community.

Still another class entitled to the benefit of the statute is that unidentifiable class of citizens who prospectively could be the victims of crimes committed by persons who have been incarcerated by the State and subsequently released, but who have not received the benefit of the statute designed to rehabilitate them and thus prevent their future participation in criminal acts. This class of citizens, though undefined and prospective in nature, is nevertheless entitled to have its public officials enforce the law.

(1969); *Board of Trustees of Policemen's Pension or Relief Fund of City of Huntington v. City of Huntington*, 142 W.Va. 217, 96 S.E.2d 225 (1956). It is therefore clear that the Commissioner of Corrections has a statutory as well as a constitutional duty to establish and maintain the rehabilitative programs specified by statute at the West Virginia State Prison for Women at Pence Springs.

█ The duties of the warden of the State Prison for Women are fixed by the Commissioner of Corrections. W.Va.Code § 28–5C–3. As chief executive officer of the state prison for women, the warden has charge of the internal police, management, food, clothing, work conditions, and care of the convicts, subject to the control of the Commissioner of Corrections. W.Va.Code § 28–5–3 (1980 Replacement Vol.). As an officer of the Department of Corrections the warden must perform his duties in a manner consistent with the rehabilitative policy of W.Va.Code § 62–13–1. However, his responsibilities do not, for the most part, go to the alleviation of the deprivations alleged by the petitioners. The primary responsibility for instituting the programs specified by W.Va.Code § 62–13–4 lies with the Commissioner of Corrections. The warden is subject to his supervision and cannot unilaterally institute programs without the support of the Commissioner.

The issue we must next address is whether the Commissioner has fulfilled his statutory duty. The petitioners allege that they are routinely denied daily outdoor exercise; that they do not have access to a meaningful college course of instruction, and that they do not have available a meaningful work release program. We find that the complaints of the petitioners are largely verified by the record before this Court. Besides the pleadings and briefs of counsel, the record consists of the depositions of Philip J. Gwinn, Warden of the State Prison for Women; Mary Jane Cooper, an inmate at the prison and a petitioner; Tahlia Lynette Bell, another inmate-petitioner; and Paul DeMuro and June Roberts Chapman, two experts in the corrections field.

The deposition of Philip J. Gwinn reveals that efforts have been made to institute educational and rehabilitative programs at the women's prison, but these efforts have been seriously hampered by a lack of funds and understaffing. For example, the only full-time teacher on the prison payroll, and another instructor hired to teach typing and business courses, have both been transferred to administrative and corrections positions and currently perform no teaching duties. Educational funds are combined with medical funds in the current prison budget, in the allocated amount of $25,000. However, medical costs alone exceeded this amount in the past fiscal year.

Furthermore, it also appears from the warden's deposition that the limited educational and vocational programs that are offered at the prison bear little relation to the needs of the inmate population. The educational program consists primarily of high school equivalency (GED) classes. However, the large majority of inmates already have a high school diploma. The GED classes are therefore of no benefit to them, and no college-level courses are currently offered to inmates. Vocational training is likewise severely limited, consisting of unrelated courses held at a nearby high school (the current offering is small engine repair), and work in the prison-run sewing factory, with minimal chances of post-release employment for the inmates who participate.[2] The work-release program also presents little opportunity for inmates to receive marketable skills. The work-release job offerings are dishwashing and waitressing in a local restaurant, and there is an insufficient number of positions open for all of the inmates who qualify for work-release. Moreover, the prison has no job apprenticeship program.

**2.** Some inmates have participated in the past in vocational training courses at the federal women's prison at Alderson. However, enrollment in courses offered at Alderson is permitted only if there are vacancies which are not filled by federal prisoners. No inmates have participated in vocational training there for the past year, and the availability of the courses in the future is speculative.

Mary Jane Cooper is serving a five to eighteen year term of imprisonment at Pence Springs for unarmed robbery. Ms. Cooper has an associate degree in business management and needs thirty-six hours to complete a bachelor's degree. Ms. Cooper's education is not being furthered at Pence Springs. She has not had the opportunity to take college courses, and she has not been permitted to take vocational training classes. Ms. Cooper was, at one time, given the opportunity to take a class at the Alderson federal penitentiary. However, because she did not have the funds to pay for the books and tuition she could not take the class. Ms. Cooper complains that her outdoor exercise periods were severely restricted during the first three months of 1981. This complaint, however, has been remedied by a daily exercise policy initiated by the warden on April 15, 1981.

Tahlia Lynette Bell is an inmate serving a one to ten year sentence at Pence Springs for forgery. Prior to her incarceration, Ms. Bell worked as a key punch operator, and would like to take additional courses in key punch and computer programming. No such courses are offered at Pence Springs. She has asked to take every college course offered to inmates since the date of her incarceration. Except in one instance, all of her requests were denied. Ms. Bell complains that there is nothing to do from day to day at the prison. She also complains of restricted outdoor exercise during the first three months of 1981, and believes the new exercise policy instituted on April 15, 1981 is a reaction to the petition filed in this case.

Two experts for the petitioners were deposed in this case. They are Mr. Paul DeMuro, Director of the Office on Social Justice for Young People at the National Council on Crime and Delinquency, and Ms. Jane Roberts Chapman, Director of the Center for Policy Studies. Both experts have impressive credentials in the correc-

tions field. Both of the experts felt that the educational and rehabilitative programs offered by the Department of Corrections at Pence Springs were deficient. However, both experts believed that meaningful educational, vocational, and job placement programs could be instituted at Pence Springs with available resources. They also suggested that more could be done to secure additional funds and materials from other sources. Each of the experts detailed the type of programs which could be implemented to best serve the inmates' educational and rehabilitative needs.

■ From a review of the entire record, which we have here treated summarily, we conclude that a real and substantial effort to implement appropriate rehabilitative programs is not currently being pursued at the West Virginia State Prison for Women at Pence Springs. There is no ongoing vocational training program. Department of Corrections officials have not applied to the State Department of Education for available vocational education grants. Access to college courses is not afforded to inmates at the present time. There is no meaningful work release or job apprenticeship program. The few attempts that have been made in these areas are so limited in scope that it cannot honestly be said that they bear a rational relationship to the rehabilitative purpose of our corrections system.[3]

■ We realize that prison officials are hampered in their efforts by a lack of funds. However, the lack of funds is not a valid excuse for denying inmates, and society as a whole, the constitutional right to the benefit of legislative enactments which clearly establish the duty of the Department of Corrections to rehabilitate individuals charged to its care, and the concommitant right of those individuals to demand the benefit of those laws. "When the Legislature enacts a law giving a group of

3. The lack of meaningful educational and vocational training programs at the West Virginia State Prison for Women at Pence Springs has been well documented by the Subcommittee on Health and Social Services of the West Virginia Legislature, *see* "Report of the Subcommittee on

Health and Social Services", Jan. 1981, Dec. 1980, Nov. 1979, Nov. 1978, Jan. 1978, and Jan. 1976; and by the Department of Corrections itself, *see* T. King, *Educational Assessment* (W.Va. Dept. of Corrections, June, 1980).

individuals a clear and explicit right, there is also created an implicit corresponding duty on the part of the State to grant or enforce that right." *E.H. v. Matin,* 168 W.Va. 248, 284 S.E.2d 232 No. 15278 (1981). A legislatively conferred right is an entitlement that cannot be arbitrarily abrogated by an executive officer. Such a course of action, or in this case inaction, abhors the concept of rule of law.

■ Our State Constitution is constructed in such a manner that certain essential considerations have a mandated priority. These priorities support the proposition that the State has a basic obligation to civilization which must be met before the luxuries of life may be addressed. These basic amenities of civilization to which the government is required to give first priority include the education of our youth, *see* W.Va. Const. art. 12, § 1; *Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859 (1979), the preservation of individual liberties, *see generally* W.Va. Const. art. 3, § 1, and the proper administration of justice, *see* W.Va. Const. art. 3, § 17.

■ The initial responsibility for insuring that the necessities of civilization, as mandated by the Constitution, are provided by the State rests with the Governor. Under article 6, section 51 of the State Constitution only the Governor is granted the power and the duty to submit to the Legislature a budget for the next ensuing fiscal year. *See State ex rel. Brotherton v. Blankenship,* 158 W.Va. 390, 214 S.E.2d 467 (1975). The Constitution anticipates that the Governor shall exercise this budgetary power in a manner consistent with constitutionally mandated priorities and the laws made in pursuance thereof.[4] Moreover, the Governor, as chief executive officer has the duty to faithfully expedite the will of the people as expressed in the Constitution. W.Va. Const. art. 7, § 5. We have dealt extensively in the recent past with the constitutional roles of the Governor and the Legislature in the context of budget appropriations and expenditures, *see State ex rel. Board of Education of Kanawha County v. Rockefeller,* 167 W.Va. 72, 281 S.E.2d 131 (1981) (Harshbarger, C.J. concurring); *State ex rel. Moore v. Blankenship* 158 W.Va. 939, 217 S.E.2d 232 (1975); *State ex rel. Brotherton v. Blankenship, supra,* and there is no need for a prolonged discussion of those roles here. Suffice it to say that if the Legislature fails to enact a budget bill consistent with constitutional priorities, it is the duty of the Governor to disapprove the unconstitutional appropriations contained therein. W.Va. Const. art. 6, § 51D(11); *State ex rel. Brotherton v. Blankenship, supra.*

"[A] fundamental reason for the existence of government is the maintenance of civilization." *Moore v. Starcher, supra,* 167 W.Va. at 853, 280 S.E.2d at 696. The care a society provides its prisoners is one of the ultimate measures of its civilization. It, therefore, is our opinion that the establishment and maintenance of a corrections system is one of the essential responsibilities of government which the Governor must address in the budget before societal luxuries are addressed.

■ The incarceration of individuals who have broken society's laws is a public act for which the people through their government must take ultimate responsibility. In the words of Chief Justice Burger:

[W]hen a sheriff or marshall [sic] takes a man from the courthouse in a prison van and transports him to confinement for two or three or ten years, *this is our act.*

---

4. Subsection B(3) of article 6, section 51 of the West Virginia Constitution provides:

Each budget shall embrace an itemized estimate of the appropriations, in such form and detail as the governor shall determine or as may be prescribed by law: (a) For the legislature ... (b) for the executive department; (c) for the judiciary department ... (d) for the payment and discharge of ... any debt of the State created in conformity with the Constitution... (e) for the salaries payable by the State; (f) for such other purposes as are set forth in the Constitution and in laws made in pursuance thereof.

In *State ex rel. Trent v. Sims,* 138 W.Va. 244, 77 S.E.2d 122 (1953), we stated in regard to W.Va. Const. art. 6, § 51, that the budget bill should "provide for sufficient appropriations to maintain the public schools, the road system of the State, *the rendition of necessary public services, and all other proper subjects requiring the appropriation of public funds....*" (emphasis added). 138 W.Va. at 279, 77 S.E.2d at 142.

*We* have tolled the bell for him. And whether we like it or not, we have made him our collective responsibility. We are free to do something about him; he is not. (emphasis in original). Address by the Chief Justice, 25 Record of the Ass'n of the Bar of the City of New York at 17 (March 1970 Supp.).

In recognition of this responsibility our Legislature has said that inmates incarcerated in state prisons shall be rehabilitated through programs of classification, education and treatment. A plea of lack of funds is an insufficient justification for the failure of the executive department to implement this mandate. "Politically motivated pleas of public poverty cannot be used to brush aside the fundamental duties of government to the maintenance of civilization." *Moore v. Starcher, supra,* 167 W.Va. at 853, 280 S.E.2d at 696.

In short, we must conclude from the record before us that the Commissioner of Corrections has not fulfilled his constitutional duty to faithfully execute the pertinent statutes requiring the establishment and maintenance of programs of classification, education, and treatment "to the end that persons committed to institutions of the State for crime or delinquency shall be afforded individual and group treatment to reestablish their ability to live peaceably ...." W.Va.Code § 62–13–1, and that his plea of lack of funds is an insufficient justification for the failure to institute such programs.

### C

Prior to the filing of their petition in this proceeding, the petitioners brought an action in the Federal District Court for the Southern District of West Virginia seeking declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1343. In their complaint, the petitioners allege that they have suffered various deprivations, including the "[l]ack of adequate indoor and outdoor exercise ... [and] of adequate recreational, vocational, educational, work and rehabilitative programs" in violation of the United States and West Virginia Constitutions and of West Virginia statutory law. The respondents contend that the petitioners' pending federal cause of action is another adequate remedy at law which precludes the issuance of a writ of mandamus by this Court. We disagree.

While it is true that mandamus is not available where another specific and adequate remedy exists, if such other remedy is not equally as beneficial, convenient, and effective, mandamus will lie. *State ex rel. Lemley v. Roberts,* 164 W.Va. 457, 260 S.E.2d 850 (1979); *State ex rel. Smoleski v. County Court,* 153 W.Va. 307, 168 S.E.2d 521 (1969); *State ex rel. Bronaugh v. City of Parkersburg,* 148 W.Va. 568, 136 S.E.2d 783 (1964). Furthermore, the trend in this Court has been to enlarge the scope of mandamus, especially where there is an urgent question of public policy or where there is no reason for delaying adjudication of the issue by the highest court of the State. *Walls v. Miller,* 162 W.Va. 563, 251 S.E.2d 491 (1979).

The remedy suggested by the State is in no sense an adequate or sufficient remedy for the relief sought by the petitioners. The claims of the petitioners in this proceeding are founded upon State law and involve the statutory responsibilities of State officials. It is not necessary for the petitioners to exhaust all possible federal remedies before they have entitlement to seek in this Court a writ requiring State officials to enforce State law.

To require the exhaustion by the petitioners of their § 1983 action would place them in a situation where the federal courts would decline to act because unsettled questions of State law are involved, and the State courts would not act because all federal remedies have not been exhausted, the ultimate result being that the petitioners would have no forum in which to assert their claims. Moreover, even if the federal court were inclined to take cognizance of those claims of the petitioners based on State law, it is unlikely that those claims could be ultimately resolved until this Court interprets the operative terms of the statute upon which the petitioners rely. "[A] remedy cannot be said to be fully adequate to meet the justice and necessities of a case, unless it reaches the end

intended, and actually compels a performance of the duty in question." *Bronough v. City of Parkersburg, supra,* 148 W.Va. at 573, 136 S.E.2d at 786.

■ Consequently we are unable to conclude that the petitioners' federal cause of action is equally as beneficial, convenient, and effective as a state mandamus proceeding. Unsettled questions of state law are left to the jurisdiction of state courts. We therefore hold that the petitioners' federal cause of action seeking declaratory and injunctive relief is not another adequate remedy which will preclude the issuance of a writ of mandamus where the issues to be resolved in both proceedings involve an unsettled question of West Virginia law.

### III

Finally, in order to provide guidance to the corrections officials who are charged with the duty of enforcing the Legislature's mandate, we must address the minimum standards required by W.Va.Code §§ 62–13–1 and 62–13–4. The statutes require the establishment of a "just, humane and efficient" program of rehabilitation. In furtherance of this goal W.Va.Code § 62–13–4 specifically requires the establishment of programs of classification, education, and treatment. We have already held that the programs currently existing at the West Virginia State Prison for Women at Pence Springs do not satisfy these statutory requirements. We must now determine the minimum efforts necessary to bring the State Prison for Women into compliance with the legislative mandate. To do so we must necessarily define the operative terms of the pertinent statutes, *i.e.,* "classification", "education", and "treatment".

■ We presume that when the Legislature used the terms "classification", "education" and "treatment", it intended those terms to be consistent with the underlying policy of rehabilitation contained in W.Va. Code § 62–13–1, and meant that the terms should be interpreted in the sense that they specify the credible efforts of a civilized society to implement that policy. Furthermore, since the provisions of W.Va.Code § 62–13–4 are directed to the Commissioner of Corrections, we believe the programs of classification, education and treatment therein specified, must contain the fundamental essentials necessary for credibility in the judgment of corrections accrediting professionals.[5]

■ In an effort to give correction administrators a set of reasonable and meaningful guidelines consistent with minimum constitutional and humane standards, the American Correctional Association and the Commission on Accreditation for Corrections has promulgated a set of minimum standards utilized in the accreditation process administered by the Commission. The content of the Commission's standards is the product of a long and thoughtful process of debate and deliberation, and represent the best consensus of professionals in the corrections field. *See* American Correctional Association, *Standards for Adult Correctional Institutions* xv–xvi (2d ed. 1981). This body of work by the American Correctional Association and the Commission on Accreditation for Corrections is reliable commentary which adds detail and specialized meaning to the terms of W.Va. Code § 62–13–4. Accordingly, we adopt the Committee's definitions set out in the appendix to this opinion, as the standards which satisfy the statutory mandate for the rehabilitation of inmates through programs of classification, education and treatment.[6]

5. We reached a similar conclusion in *E.H. v. Matin, supra,* where we held that W.Va.Code § 27–5–9, which specifies the care and treatment to be accorded patients in state mental institutions, "requires a system of custody and treatment in State mental hospitals which reflects the competent application of current, available scientific knowledge." Syllabus Point 2, *E.H. v. Matin, supra.*

6. This is not the first instance in which standards promulgated by foreign non-governmental entities have been incorporated by reference into West Virginia statutory law. *See, e.g.,* W.Va.Code § 21–3–3a (1981 Replacement Vol.) (National Electrical Code); § 21–9–3 (1981 Replacement Vol.) (Mobile Home Safety Code); and § 29–3–5 (1980 Replacement Vol.) (Fire Code).

## IV

▉▉▉ The record before us indicates that the educational and rehabilitative programs currently existing at the State Prison for Women at Pence Springs do not meet the mandate of W.Va.Code §§ 62–13–1 and 62–13–4, and we have concluded that the petitioners are entitled to a writ of mandamus requiring the Commissioner of Corrections to comply with the statutory mandate. However, we do not have sufficient information before us to specify the necessary changes to bring the rehabilitative program at the State Prison for Women into compliance with the required minimum standards. As we stated in *E.H. v. Matin, supra,*: "In cases of this type it is important for courts to recognize that we are not experts in ... institutional management." Accordingly, we are transferring this case to the 13th Judicial Circuit and we assign Circuit Judge Ronald E. Wilson to preside in the case and order that he proceed to develop an appropriate remedy consistent with the contemporary standards of prison administration.

It is therefore ordered that this case be docketed as if it were an original mandamus proceeding. It is further ordered that within 180 days from the service of this Court's order upon the respondents that they submit a plan to the circuit court through which the programs of education, rehabilitation, and treatment may be implemented. After submission of the plan the petitioners shall have an additional 60 days to file their objections to the plan along with any alternative plan they may wish to present. Thereafter the circuit court shall hold hearings to resolve the issues in dispute. The plan ultimately approved by the circuit court must be consistent with the contemporary standards of scientific prison administration recognized in this opinion. The circuit court shall have continuing jurisdiction of all further proceedings necessary to insure implementation of the approved plan by the appropriate corrections officials.

As a final comment we note that the requirements of W.Va.Code §§ 62–13–1 and 62–13–4, as interpreted by this Court,

remedy all of the complaints of the petitioners except their claim for daily exercise. This claim, however, has been rendered moot by the commendable action of the warden initiating the exercise program currently in effect at the women's prison. We note with approval the actions of the warden in this respect and we trust, request, and order that an exercise policy such as that currently in force at the women's prison shall be maintained in the future.

In summary, we hold that inherent in the republican form of government established by our State Constitution is a concept of due process which insures that the people receive the benefit of legislative enactments. The Legislature has provided that rehabilitation is the primary purpose of confinement in state prisons, and has specified that programs of classification, education and treatment must be implemented in furtherance of that policy. The Department of Corrections is the government agency responsible for implementing the policy specified by the Legislature. It has not fulfilled its policy mandate and the petitioners have no other adequate remedy to enforce their rights. Consequently, the case is assigned to the 13th Judicial Circuit where Judge Ronald E. Wilson is to sit and proceed to develop an appropriate remedy consistent with this opinion.

Transferred to the 13th Judicial Circuit with directions.

### APPENDIX

The following are the standards for adult correctional institutions promulgated by the American Correctional Association in cooperation with the Commission on Accreditation for Corrections regarding classification, inmate work programs, and academic and vocational education which we have adopted as the standards which will satisfy the requirements of W.Va.Code §§ 62–13–1 and 62–13–4:

CLASSIFICATION

2–4399 There is a written plan for inmate classification which specifies the objectives of the classification system, details the methods for achieving the objectives, and provides a monitoring and evaluation mech-

anism to determine whether the objectives are being met. The plan is reviewed at least annually and updated if necessary. (Essential)

> Discussion: The classification system should help ensure that inmates participate in appropriate, integrated programs that will assist them during their incarceration and subsequent release to the community. The classification system should consider an assessment of risk and the efficient management of the inmate population. It should provide that no inmate receives more surveillance or assistance than required and that no inmate is kept in a more secure status than potential risk requires.

2–4400 There are classification policies with detailed procedures for implementing them; these policies are made available to all staff involved with classification, and reviewed at least annually and updated if necessary. (Essential)

> Discussion: Classification policies should include, at a minimum: (1) detailed procedures for initial inmate classification and reclassification; (2) instructions regarding the makeup of the unit, team or full classification committees, as well as the duties and responsibilities of each; (3) definition of the various committees' responsibilities for custody employment and vocational/program assignments; (4) instructions as to what phases of an inmate program may be changed by the various committee levels; (5) specific procedures relating to inmate transfer from one program to another and from one institution to another; and (6) content of the classification interview.

2–4401 The system for classifying inmates specifies the level of custodial control required and requires a regular review of each classification. (Essential)

> Discussion: A correctional system should provide for at least three degrees of custodial control for inmates. All inmates should be assigned the least restrictive custodial level necessary.

2–4402 Youths charged with offenses which would not be crimes if committed by adults and adjudicated delinquent offenders do not reside in the institution. (Mandatory)

> Discussion: None.

2–4403 The written plan for inmate classification provides for maximum involvement of representatives of relevant institutional programs and the inmate concerned in classification reviews. (Essential)

> Discussion: All new inmates should be carefully screened for proper custodial assignment and program placement. Inmates should participate in assessing their needs and in selecting programs to meet those needs. The classification process requires the cooperation and input of both the inmate and the institutional program personnel.

2–4404 The written plan for inmate classification specifies that the program status review of each inmate occurs at least every 12 months. (Essential)

> Discussion: Schedules for program status reviews vary according to the type of institution, profile of inmate population, average length of sentence, etc. Those institutions that serve younger individuals and individuals serving relatively short sentences should conduct case reviews at least every three months. Institutions serving an older population and individuals serving longer sentences should provide for program status reviews at least every 12 months. The program status review includes review of all matters affecting the status of the inmate, including custody.

2–4405 The written plan for inmate classification specifies criteria and procedures for determining and changing the program status for an inmate; the plan includes at least one level of appeal. (Essential)

> Discussion: Because program status reviews can involve an increase in level of custody, transfer to another institution, or other program changes that effect inmates adversely, the review process should include an appeal process. This refers to program status decisions, not disciplinary action.

2–4406 Written policy and procedure require that unless precluded for security or other substantial reasons, all inmates appear at their classification hearing and are given notice 48 hours prior to these hearings; such notice may be waived by the inmate, in writing. (Essential)

Discussion: Inmates should have sufficient time and assistance, if requested, to prepare for classification hearings so that they may present any evidence or testimony that would ensure them an appropriate classification.

2–4407 Written policy and procedure specify the conditions under which an inmate can initiate a review of progress and program status. (Important)

Discussion: In addition to participating in assessing their needs and selecting responsive programs, inmates should be allowed to initiate reviews that determine the extent of their progress and the effectiveness of their programming.

2–4408 Written policy and procedure provide for identification of special needs inmates. (Essential)

Discussion: Special needs inmates include, but are not limited to, drug addicts, drug abusers, alcoholics, alcohol abusers, inmates who are emotionally disturbed, mentally retarded, suspected mentally ill, or who pose high risk or require protective custody. Procedures should exist to identify the number, type and frequency of commitment of those groups of inmates. When numbers or frequency of commitment warrant, special programs should be instituted for the appropriate management and effective handling of these inmates. Every possible effort should be made to place mentally ill or mentally retarded inmates in a noncorrectional setting.

2–4409 The written plan for inmate classification specifies that, prior to a parole hearing, preparole material is made available to the paroling authority including a current and complete history of the inmate's activities in the institution and a proposed parole plan. (Essential)

Discussion: A progress report that includes the inmate's plans for parole should be prepared prior to the inmate's appearance before the paroling authority. This report will enable the paroling authority to make a well-informed decision on the inmate's readiness for release.

2–4410 The institution or parent agency solicits and uses preinstitutional assessment information regarding the inmate's progress and adjustment. (Essential)

Discussion: When inmates have contact with the criminal justice system prior to their admission to the institution, (e.g., in local detention facilities or work release programs) any information on their progress should be solicited and incorporated in the institution's classification decision. Likewise, any documented information on the inmate's participation in other community activities should be considered.

INMATE WORK PROGRAMS

2–4411 The institution maintains a written plan that provides full-time work and/or program assignments for all inmates in the general population. (Essential)

Discussion: An inmate work program may include industrial, agricultural, maintenance, and service jobs and should provide employment for all eligible inmates. Sufficient jobs and/or program opportunities should be provided so that there is no idleness.

2–4412 The institution provides a variety of work assignments that afford inmates an opportunity to learn job skills and develop good work habits and attitudes that they can apply to jobs after they are released. (Important)

Discussion: Whenever possible, inmate work assignments provide experience relevant to the current job market. Work assignments for women are not limited to traditional tasks assigned to women.

2–4413 An effort is made to structure the inmate work day to approximate the work day in the community. (Important)

Discussion: The inmate working day should last approximately eight hours so that inmates will be familiar with what

will be expected of them in their postrelease jobs.

2-4414 A written plan provides incentives for inmates in work programs; inmates are paid for work performed. (Essential)

Discussion: Inmates should be paid sufficient wages so that they can make purchases from the canteen and accumulate funds to assist them upon their release from prison. Incentives such as wages, special housing, extra privileges, and good time credits should be distributed according to written guidelines.

2-4415 Staff operating inmate work programs use the advice and assistance of labor, business, and industrial organizations to assist in providing skills relevant to the market. (Important)

Discussion: The institution should actively pursue cooperation from labor and industry to help plan and evaluate institution work programs and assist in work release, job training and job placement. The establishment of advisory boards or joint councils should be considered.

2-4416 Policy and procedure provide that all institutional work, industrial, and vocational/educational programs meet minimum federal, state and local work, health, and safety standards; there is documentation of at least annual health and safety inspections by federal, state, and/or local officials. Weekly inspections of all such programs are conducted by qualified institution staff. (Mandatory)

Discussion: Inmate work programs should meet all applicable requirements for the safety and health of workers. A mechanism, such as a safety committee should be used to conduct weekly inspections and continuously monitor the operation of the programs.

2-4417 Inmates employed in the community by public or private organizations in positions normally occupied by private citizens are compensated at the prevailing rate. Inmates receiving such compensation reimburse the jurisdiction for a reasonable share of its cost in maintaining them. (Essential)

Discussion: Compensation for all work performed for public or private organizations, whether on work release programs or as part of an outside work assignment plan, should be at the prevailing rate and should include all fringe benefits.

2-4418 The institution provides opportunities for inmate employment in correctional industries, facility maintenance, operation, and, to the extent possible, public works and community projects. (Important)

Discussion: Many jobs that must be performed to ensure the maintenance and operation of the facility can be done by inmates. Inmates may be assigned to construction work, conservation projects or other work financed by public funds. These programs may be housed separately from the main institution. Staff supervising such inmates should be trained for such an assignment.

2-4419 Written policy and procedure establish furlough and work release programs to provide additional employment opportunities for inmates, consistent with the requirements of institutional and community security. (Important)

Discussion: None.

2-4420 Private industries on the institution grounds employing inmates in positions normally filled by private citizens pay inmates the prevailing wage rate for the position occupied. (Important)

Discussion: Whenever private industry employs inmates as part of its regular work force, the inmates must be paid the same as private citizens who would normally perform such work. Reimbursement to the institution for room and board may be required.

2-4421 The inmate work plan includes provision for employment for handicapped inmates. (Essential)

Discussion: None.

ACADEMIC AND VOCATIONAL EDUCATION

2-4422 There is a comprehensive education program available to all eligible inmates that extends from literacy training

through high school and includes communication skills, mathematics, and social science. (Essential)

Discussion: Offenders vary greatly in learning ability, interest level, and motivation. The educational program should be structured so that an inmate can enter at any time and proceed at their own pace. Progress through the program should not be defined by grade level attainment or academic marks or scores. Individual instruction should be supplemented by the use of programmed instruction, teaching machines, educational television and correspondence courses when appropriate.

2-4423 The academic and vocational education programs are accredited by the state department of education or a recognized accreditation association. Programs up to the completion of high school and/or GED are available at no cost to inmates. (Essential)

Discussion: Accreditation by state department of education or recognized regional accreditation associations will ensure that correctional academic and vocational education programs meet current standards.

2-4424 There is a standardized competency-based curriculum supported by appropriate materials and classroom resources. (Essential)

Discussion: In competency-based education instruction, assignments and times may vary, while achievement is a constant goal. Instructional objectives should be stated in terms in which the performance is observable or assessable. Emphasis should be placed on individual student progress with evaluation based on performance according to a set criterion. Standartization of curriculum should be developed in order to monitor student progress from class to class or between institutions.

2-4425 There is a system for ensuring that the academic and vocational education program continues to meet the needs of the inmate population. (Essential)

Discussion: Meeting the educational needs of inmates requires a thorough knowledge of those to be served. Close working relationships between educational and classification personnel are essential. The process of developing cirricula should include input from inmates, and a system should be developed to review the education program regularly.

2-4426 Some educational programs are provided at a time when the majority of inmates can take advantage of the opportunity. (Important)

Discussion: Educational programs should not have to compete with work assignments, visitation, counseling, etc., but should be offered at off peak program hours and should be available in the evenings and on weekends. Encouragement to participate should be provided through limiting barriers to attendance and use of a reward system.

2-4427 There is a systematic approach to determine the personnel requirements for the academic and vocational programs to ensure all inmates access to staff and services. (Essential)

Discussion: The staff/inmate ratio is a significant factor influencing effectiveness in any teaching environment. Inmates require at least the same interaction, feedback, and personal attention as students in educational and vocational programs outside the institution.

2-4428 All academic and vocational education personnel are certified by a state department of education of other comparable authority. (Essential)

Discussion: All teachers, supervisors, and administrators should be certified by the state department of education, or other comparable body, and should receive additional training to meet the special needs of inmates.

2-4429 Academic and vocational personnel policies and practices are comparable to local jurisdictions or other appropriate jurisdictions. (Important)

Discussion: Personnel practices should be similar to those of the public schools in the locality of the institution.

2-4430 Salary and benefits for academic and vocational personnel are at least the

same as state minimums for teachers performing comparable work. (Important)

Discussion: Salaries and benefits should meet the minimum state standards and compare favorably with local systems to ensure the recruitment and retention of qualified staff.

2–4431 The educational program is supported by specialized equipment, including, at a minimum, classrooms, teaching carrels, audiovisual materials and facilities, chalkboards, and administrative space. (Essential)

Discussion: Regardless of the extent of the educational program, specialized facilities and equipment are essential.

2–4432 The institutional staff and/or parent agency conducts an annual evaluation to assess the effectiveness of the academic and vocational education program against stated performance objectives. (Essential)

Discussion: The educational evaluation should be conducted annually and the results submitted to the warden/superintendent for review.

2–4433 There is a system whereby the academic and vocational training programs are assessed against stated objectives by qualified individuals, professional groups, and trade associations; this assessment is done at least every three years. (Essential)

Discussion: Such assessment is necessary to ensure that the institution's educational/vocational training programs are recognized and accepted by professional educators, licensing boards, and trade associations. This system of accountability can also indicate those programs that are ineffective and those that should be expended or revised. Justifications may be developed for budget presentations.

2–4434 Academic and vocational counseling are provided so that inmates are placed in the phase of the educational/vocational programs most suited to their needs and abilities. (Essential)

Discussion: Counseling should provide inmates assistance, encouragement and feedback with respect to their educational and vocational goals.

2–4435 The educational program allows for flexible scheduling that permits inmates to enter at any time and to proceed at their own learning pace. (Essential)

Discussion: Offenders vary greatly in learning ability, interest level and motivation. The educational program should be structured so that an inmate can enter at any time and proceed through the various grades at a comfortable pace. Individualized instruction is essential. Programmed instruction, teaching machines and educational television may be used in addition to traditional teaching methods.

2–4436 Postsecondary programs in academic and vocational education are available to qualified inmates. (Important)

Discussion: Such classes should be available in the institution and supplemented by outside programs. They should be available to all who qualify and are interested.

2–4437 The institution uses community resources in developing academic and vocational education programs for selected inmates. (Important)

Discussion: Academic and vocational programs in the community can supplement the institution's programs. Based on predetermined criteria, arrangements should be made for selected inmates to attend classes at nearby schools.

2–4438 The educational program in coordination with other institutional services provides instruction in functional social skills. (Essential)

Discussion: The institution should provide courses in consumer activities, life skills, and family life, and, where possible, should incorporate instruction of social skills in regular course content. Such courses should be coordinated with social services, leisure time activities and religious programs, and in a comprehensive social skills development program.

2–4439 Vocational training programs are integrated with academic programs and are relevant to the vocational needs of inmates and to employment opportunities in the community. (Essential)

Discussion: Vocational training programs should be related to the job market. A variety of areas should be available including cooperation with correctional industries, work assignments, apprenticeships, on-the-job training, and other vocationally related programs. The community's employment needs can be assessed through contacts with local labor and industry representatives. Equipment and curricula for the vocational training programs should be Updated periodically to ensure compatability with training developments in the community. Existing community resources and involvement should be used where appropriate.

2–4440 Written policy and procedure govern the maintenance and handling of educational/vocational records. (Essential)

Discussion: Academic/vocational information should become part of the master file and be transferred when offenders are moved to other institutions or relocated in the community during prerelease.

2–4441 Provision is made for formal recognition of specific educational accomplishments. (Important)

Discussion: Recognition of academic and vocational achievements such as certification or graduation is helpful to individual inmates and provides general support for educational programs.

American Correctional Association in cooperation with Commission on Accreditation for Corrections, *Standards for Adult Correctional Institutions* at 104–112 (2d ed. 1981) (references to related standards omitted).

NEELY, Justice, concurring:

I concur only to point out that three quarters of the majority opinion in this case is unnecessary dicta. Since the bar of this State take the writings of this Court seriously, I consider it a disservice to the bar to write a broad treatise on government which serves no function germane to the case. Furthermore, the treatise is entirely inaccurate in that it paints a picture in black and white without taking into consideration real life's mottled shades of gray. Treatises are almost always about black and white while real cases and controversies are uniformly about shades of gray.

While the petitioners in this case have a right to humane treatment under the statutes cited by the majority opinion, that issue alone decides the case. Furthermore, it is entirely proper to transfer the case to the Circuit Court of Kanawha County to develop a plan that will meet the Legislature's mandates as set forth in the statutes. Additional discussion is surplusage.

Finally, I would disassociate myself from any language that addresses how this case will be received by the public in general. This Court's job is to enforce the law; the citizens of this State have deliberately accorded to elected judges very long terms for the specific purpose of insulating them from the pressure of public opinion. I find that the entire judicial process is disparaged when the courts apologize for applying the law impartially.

MILLER, Chief Justice, concurring:

While I concur in the result reached in this case, I would have avoided the rather amorphous due process discussion embodied in Syllabus Points 1 and 2 and their companion textual discussion.

A more appropriate analysis would be to take the mandatory provisions of W.Va. Code, 62–13–4 (1977), requiring the Department of Corrections to establish "a varied program of education for all inmates in all institutions within the department," as well as industrial training programs,[1] and to

---

1. The salient provisions of W.Va.Code, 62–13–4, are:

"To accomplish the purposes of this article, the commissioner (or the director of corrections management if one is appointed) shall:

"a. Exercise general supervision over the administration of the institutions under the jurisdiction of the department;

"b. Establish separate subdivisions, to be headed by deputy directors, of adult services, youth services, and other subdivisions as he deems advisable, which may be headed by the

conclude under *Hurley v. Allied Chemical Corp.*, 164 W.Va. 268, 262 S.E.2d 757 (1980), that this statute provides a cause of action for its enforcement by the inmates. We established in Syllabus Point 1 of *Hurley, supra,* the following criteria for determining if a legislative act gives rise to a private cause of action:

"The following is the appropriate test to determine when a State statute gives rise by implication to a private cause of action: (1) the plaintiff must be a member of the class for whose benefit the statute was enacted; (2) consideration must be given to legislative intent, express or implied, to determine whether a private cause of action was intended; (3) an analysis must be made of whether a private cause of action is consistent with the underlying purposes of the legislative scheme; and (4) such private cause of action must not intrude into an area delegated exclusively to the federal government."

*See also Jenkins v. J.C. Penney Casualty Ins. Co.,* 167 W.Va. 597, 280 S.E.2d 252 (1981).

Certainly, where the petitioners, as here, are seeking through mandamus to enforce a mandatory legislative right, the situation is directly analogous to *E.H. v. Matin,* 168 W.Va. 248, 284 S.E.2d 232 (1981),

where we held that the provisions of W.Va. Code, 27–5–9 (1977), gave certain enforceable rights to inmates of our State mental institutions. In the present case we are also aided by the preliminary legislative statement found in W.Va.Code, 62–13–1, which declares that "[t]his article shall be liberally construed." [2]

---

same or different deputy directors, which said deputy directors must be graduates of an accredited college or university with a degree in sociology, psychology, social science or a related field;

"c. Establish rules and regulations in writing governing all subdivisions and institutions within the department;

"d. Establish an in-service training program for personnel of the department;

"e. Classify the institutions of the department, varying according to such factors as security features, program, age and sex of inmates, physical stature or size, character of inmates;

"f. Establish a system of classification of inmates, through a reception and examination procedure, and in each institution a classification committee and procedure for assignment of inmates within the programs of the institution;

"g. Establish, maintain and direct a varied program of education for inmates in all institutions within the department;

"h. Supervise the treatment, custody and discipline of all inmates and the maintenance of the institutions and their industries;

"i. Establish a system of compensation for inmates of the correctional institutions of the State who perform good and satisfactory work either within the industrial program or in the servicing and maintenance of the correctional institutions or any other institutions or camps within the State. The commissioner (or the director, with the approval of the commissioner) may establish a graduated scale of compensation to be paid to inmates in accordance with their skill in industry."

**2.** The full text of W.Va.Code, 62–13–1, is:

"This article shall be liberally construed, to the end that persons committed to institutions of the State for crime or delinquency shall be afforded individual and group treatment to reestablish their ability to live peaceably and, consistent with the protection of the community, to release such individuals at the earliest possible date, and to establish a just, humane and efficient program, and to avoid duplication and waste of effort and money on the part of public and private agencies."