307 S.E.2d 625

**Cebert M. MEADOWS, et al.**

v.

**Gretchen O. LEWIS, Commr., etc.**

**No. 15838.**

Supreme Court of Appeals of West Virginia.

July 7, 1983.

Rehearing Denied Oct. 20, 1983.

Dan L. Hardway, Sterl F. Shinaberry, Charleston, for petitioners.

Donald L. Hall, Sr. Counsel, Legal Div., Workers' Compensation Fund, Charleston, for respondent.

McGRAW, Chief Justice:

This is an original proceeding in mandamus. The petitioners, Cebert M. Meadows, Martha E. Reichard, and Gerald R. Manning, are three workers who suffered injuries in the course of and resulting from their employment. They seek to compel the State Workers' Compensation Commissioner, Gretchen Lewis, to fulfill the statutory duties of her office. Specifically, the petitioners charge that the commissioner consistently disregards and fails to perform the mandatory duties prescribed by W.Va.Code §§ 23–4–1c; 23–1–13; 23–4–16; and 23–5–1 (1981 Replacement Vol.)[1] We find that the commissioner has not fulfilled the mandatory duties prescribed by statute, and accordingly, we grant the writ.

1. With the exception of W.Va.Code § 23–1–13, all the aforementioned statutes require the commissioner to act either immediately or within a certain period of time. W.Va.Code § 23–4–1c provides, *inter alia,* that the commissioner shall determine the compensability of a claim and may commence payment of TTD benefits immediately upon receipt of the employer's report of injury, and shall in any case commence payment of benefits for a compensable injury within 15 days of receipt of the employee's or employer's report, whichever is received sooner, and receipt of a physician's report and any other necessary information. Upon a finding that a claimant whose previous claim has been closed, has suffered further TTD or requires further treatment, the commissioner shall immediately commence payment of TTD benefits. W.Va.Code § 23–4–16 provides that the commis-sioner shall rule upon the merits of an application for adjustment to a claim within 30 days after the filing of the application. W.Va.Code § 23–5–1 establishes a timetable with regard to hearings on objections made to the commissioner's findings. Within 15 days of the receipt of an objection the commissioner is required to set a time and place for the hearing of evidence. Both the employer and the claimant must be given notice of the hearing 10 days in advance thereof, and the hearing must be held within 30 days of the filing of the objections. The commissioner shall render his decision within 30 days after final hearing. Pursuant to W.Va. Code § 23–1–13, the commissioner is granted rule-making authority. The commissioner is required to adopt rules which, among other things, "prescribe the time within which adjudications and awards shall be made."

## I.

### MEADOWS CLAIM

On November 7, 1977, Cebert M. Meadows was employed by International Electrical Contractors, Inc., of Miami, Florida, and was working as an electrician in Wheeling, West Virginia, when he tripped over a cable and injured his left knee. Meadows filed an application for workers' compensation benefits on November 10, 1977. The next day, his employer filed its report. The initial physician's report, completed by Dr. Murphy of Glendale, West Virginia, was filed on November 28, 1977. The injury was diagnosed as a sprain or a meniscus tear of the left knee. Dr. Murphy indicated that Meadows had stopped work on November 10, 1977 (also the date of first treatment), and would be able to return to work on November 17, 1977. The employer's report and a subsequent report from Dr. Glass of the Wheeling Clinic indicated that Meadows had not stopped working.

On February 4, 1978, the injury was ruled compensable on a no-lost-time basis. The notification letter requested that Meadows inform the commissioner immediately if he were disabled for four or more days. There is no record of any response by Meadows to this notice.

During the two years following the commissioner's initial ruling of compensability, various physicians submitted reports, all of which indicated that Meadows continued to have problems with his injured knee. In early 1979, Meadows moved to Ashland, Kentucky. In April of that year, Dr. Touma made a diagnosis of degenerative arthritis. A report dated July 6, 1979, from Dr. Craythorne of Huntington, West Virginia, to whom Meadows was referred by the commissioner, indicated that the claimant had not reached his maximum degree of improvement. In July of 1979, Meadows moved to Tennessee. Dr. Williams of Johnson City diagnosed Williams as suffering from "severe osteoarthritis, tricompartmental left knee." Dr. Williams further stated that the claimant was totally disabled for any manual labor from September 11, 1979 until January 21, 1980.

The commissioner was informed on February 11, 1980, that Meadows had not worked since May 16, 1979, and had received unemployment compensation from May 21, 1979 until November 1, 1979. Meadows, by counsel, requested payment of TTD benefits from November 1, 1979. On April 4, 1980, the commissioner awarded the claimant TTD benefits from February 18, 1980 to, but not including, March 28, 1980. Meadows was given thirty days to submit additional evidence to justify keeping the claim open. On May 9, 1980, the claim was closed on a TTD basis by order of the commissioner, on the ground that no attending physician's report (WC–219) had been received within thirty days of the date of the previous order.

Meadows filed a timely objection to the order closing his claim and submitted a WC–219 completed by Dr. Williams on May 22, 1980. The return-to-work date was listed in the report as "unknown" and the date of next examination was shown as July 21, 1980. Dr. Williams also indicated that additional hospitalization would be required. On May 30, 1980, Meadows' counsel petitioned to reopen the claim. However, on June 2, 1980, the commissioner set aside the May 9, 1980 order, explaining that sufficient medical evidence had been timely submitted and that the claim had been closed due to a clerical error. Although the order closing the claim was "set aside and held for naught," the petition to reopen the claim was processed. On July 16, 1980, the commissioner acknowledged receipt of the reopening petition, and stated that the request established a *prima facie* case for reopening. Meadows was notified that unless his employer protested within thirty days, the claim would be reopened on a TTD basis.

On July 21, 1980, counsel wrote to the commissioner stating that benefits had been paid through May of 1980. Benefits were requested from May 22, 1980 to July 21, 1980. In response to the July 21 letter, an "Inquiry Specialist" wrote to Meadows' counsel that "[t]emporary total disability benefits cannot be paid unless the physician states exact dates." Because Dr. Williams had written "unknown" as the

anticipated period of disability on the most recent WC–219, the report would not be used as the basis for paying TTD benefits.

On August 6, 1980, the TTD claim was closed for the second time because medical evidence had not been submitted showing that Meadows was still disabled and unable to work. On August 14, 1980, Meadows petitioned to reopen the claim. One week later, the process which had been set in motion by the petition to reopen, submitted May 30, 1980, culminated in the commissioner's order reopening the claim. On September 2, 1980, TTD benefits were awarded from May 22, 1980 through July 21, 1980, the latter date coinciding with the next scheduled examination reported on Dr. Williams' WC–219, submitted May 22, 1980.

The reopening did not stop the protest process. On October 1, 1980, the commissioner acknowledged the receipt of Meadows' protest to the May 9, 1980 order. Meadows was informed that he was "entitled to a hearing which shall be held at a time and place to be later fixed." The protest hearing was scheduled for December 1, 1980, in Wheeling, West Virginia, and respondent informs us that only the hearing examiner showed up.

On November 5, 1980, the TTD claim was closed again, and on November 21, 1980, Meadows protested. On December 1, the November 5 order was set aside and held for naught, having been entered through clerical error. However, the protest survived the setting aside of the order, and Meadows was notified on January 30, 1981, that "a hearing ... shall be scheduled at a time and place later to be fixed." Meadows withdrew the protest on February 17, 1981.

Meanwhile, on November 11, 1980, Meadows' counsel wrote to the commissioner, expressing his "befuddlement" at the apparently contradictory correspondence which he and his client had received. Counsel also wondered why a hearing was scheduled since the protested order had already been set aside, and, in a separate action, the claim had been reopened.

On December 2, 1980, TTD benefits were awarded from July 22 through January 30, 1981. TTD benefits for the period January 6 through February 4, were further awarded on January 14, 1981. Benefits were not paid for any period after February 5, 1981, but no order closing the claim and terminating TTD benefits was entered until December 22, 1981.

On March 9, 1981, a request was made to reinstate TTD benefits. On March 12, the commissioner informed Meadows that additional medical evidence would be required. A WC–219 had been submitted on January 28, 1981, by Dr. Williams, who ambiguously reported that Meadows had reached his maximum degree of improvement, but would require additional hospitalization; that he would be disabled for three months and would be able to return to work on January 28, 1982. The commissioner requested an operative report, as well as hospital admission and discharge summaries. There was no operative report because although Meadows had been scheduled for surgery, he had twice postponed it. Dr. Williams reported on February 25, 1981 that Meadows was "unable to do heavy work or assembly line type work," and that he would continue to receive treatment. A second request to reinstate TTD benefits was made on May 6, 1981.

On August 6, 1981 a hearing was held on the protest (which had previously been withdrawn) to the November 5, 1980 order (which had been set aside on December 1, 1980). Nevertheless, Meadows and his attorney appeared at the hearing to formally move for reinstatement of TTD benefits. Meadows testified that he had a sixth grade education and had worked in the mines for approximately ten years starting when he was 13 years old. Thereafter he worked as an electrician in the construction trade for about 40 years until his injury. He further stated that he had decided not to undergo surgery in January of 1981, after Dr. Williams advised him that the arthoplasty was elective and that, despite a likelihood of some success, there was a chance that regardless of the operation he might not be able to return to work again.

At the close of the hearing, motions were made to immediately reinstate TTD benefits, and to leave the claim open for submission of additional medical reports. The hearing examiner stated that the reinstatement motion would be submitted for decision, and that the claim would be continued until the next available Charleston docket. Subsequently, on September 18, 1981, Dr. Williams submitted a report in which he stated: "[Meadows'] symptoms have progressed over the last 2 years, and I have recommended a total knee arthroplasty and joint surface replacement. Mr. Meadows has now agreed to have this surgery done, and would like to have this scheduled." The surgery was performed on October 7, 1981.

On December 22, 1981, the commissioner entered an order closing the claim and terminating TTD benefits, as of February 5, 1981. The reasons given were: (1) "sufficient evidence to justify the payment of additional temporary total disability benefits after February 4, 1981, has not been received by the Fund," and (2) "the claimant has repeatedly elected to delay the surgery." [2] This order was protested by Meadows' counsel on January 20, 1982. In response to the protest, the commissioner once again informed Meadows that he was "entitled to a hearing which shall be held at a time and place to be later fixed."

Meadows was ultimately granted a 35% award for permanent partial disability (PPD) on July 27, 1982, based on an examination performed by Dr. Robert G. Smith of Huntington, West Virginia. This award was protested on August 9, 1982, and a combined hearing was held on the two pending objections on September 28, 1982. The protest to the PPD award was continued and is not contested here. The TTD claim was also continued. Meadows' counsel requested that the case file be evaluated to determine whether TTD benefits ought to be paid, or, alternatively, what further evidence would be required to prove entitlement to the benefits. Inexplicably, the request was denied on December 28, 1982. A further hearing was held on March 3, 1983, at which time, counsel again requested payment of TTD benefits. We do not have a transcript of this most recent hearing, nor do we have a subsequent record of a decision in the matter.

## II.

### REICHARD CLAIM

Martha E. Reichard, an employee of the Piece Goods Shop in Beckley, West Virginia, injured her right forearm, right wrist, and left knee on July 31, 1979, while unloading material from a delivery truck. She was treated initially on August 2, 1979 in the emergency room of the Raleigh General Hospital. In early August of 1979, her employer transferred her to North Carolina, where she continued under a physician's care.

Ms. Reichard applied for workers' compensation benefits on August 22, 1979. Medical reports were filed on August 23 and August 27, 1979. An employer's report was filed on September 25, 1979, indicating that Ms. Reichard stopped working on August 2 and returned to work on August 13. The claim was ruled compensable on October 5, 1979, and benefits were paid for a period ending August 13, 1979. Thereafter, TTD benefits lapsed due to the information in the file that Ms. Reichard had returned to work. She was unable, however, to continue working, and on October 3, 1979, underwent knee surgery.

After some delay, during which Ms. Reichard and her employer corresponded with the commissioner in an effort to supply information regarding her work and medical status, the commissioner, in two orders dated March 14, 1980,[3] awarded TTD benefits from October 2, 1979 to, but not including, March 18, 1980. The commissioner explains that the delay in the

---

**2.** Dr. Williams was first authorized to perform the arthroplasty on February 1, 1980. Meadows was informed on September 19, 1980, that TTD benefits would be withheld if he refused the recommended treatment.

**3.** The record is unclear, but the second order may have been dated April 2, 1980.

payment of these benefits was the result of the use of forms supplied by the Industrial Commission of North Carolina.

In March of 1980, Ms. Reichard moved to Pennsylvania, and thereafter, her benefits again lapsed. Dr. Kraynick, of Allentown, Pennsylvania, informed the commissioner on March 20, 1980 that he would be Ms. Reichard's physician. Dr. Kraynick was notified by letter, dated April 16, 1980, that Ms. Reichard must herself make a written request for a change of physicians. On April 21, 1980, Reichard made such a request. A second request was made in August of 1980 and was received by the commissioner on August 16, 1980. By letter dated September 12, 1980, Dr. Kraynick was authorized to treat Reichard's compensable injury. A second authorization bears the date September 24, 1980.

Office notes of Reichard's treating physician in North Carolina were filed with the commissioner on March 24, 1980. The final entry, dated December 27, 1979, reports "degenerative changes" and obesity. An exercise program was recommended, and her doctor stated that she was not to work until she had lost weight. Dr. Kraynick submitted a report on April 15, 1980, in which Reichard's medical history was reviewed. Dr. Kraynick found her to be in need of an extensive program to rehabilitate her quadriceps muscle. Anti-inflammatory medication was also recommended. Dr. Kraynick concluded: "I felt she was definitely too heavy for her degenerate knees and I further felt she should be on a strict weight reduction program. I feel if she does lose 35 to 40 lbs. she would be in much better position to return to work." The report noted that Reichard commenced an active exercise program. On April 21 and May 6, 1980, Reichard was referred by the commissioner to two physicians in North Carolina for independent medical evaluation. The examinations were not performed because Reichard had already moved to Pennsylvania.

On May 7, 1980, the claim was closed on a TTD basis, for the reason that no physician's report had been received within thirty days of the April 2, 1980 order.[4] Dr. Kraynick submitted a WC–219 form on May 23, 1980, reporting that Reichard had not reached maximum improvement and that both the length of disability and return to work were "indefinite." On May 29, 1980, Ms. Reichard herself petitioned to reopen her claim. The commissioner's answer states that the petition was never acted upon. However, receipt of the petition was acknowledged in a letter dated October 22, 1980, in which Reichard was notified that her petition established a *prima facie* case for reopening. The employer was given ten days to show cause why the claim should not be reopened. No objection was made by the employer. Payment of TTD benefits for a three-month period beginning March 18, 1980, was made on February 19, 1981. The commissioner admits that there is no explanation for the delay in payment of these benefits.

On September 22, 1980, the commissioner was notified that Reichard had moved to New Mexico and continued to be unable to work. She requested a change of physicians. However, this request was refused because Reichard's treating physician in New Mexico, Dr. Goodman, was not an orthopedic surgeon. A request to authorize a second physician, Dr. Preator, was made on March 2, 1981.

The TTD claim, which had been reopened on February 19, 1981, was closed on April 23, 1981. On May 7, 1981, Reichard submitted a report prepared by Dr. Rosenbaum and petitioned to reopen the claim. Reichard also requested authorization for Dr. Rosenbaum as her treating physician. On May 11, 1981, Dr. Preator was authorized to treat Reichard, despite a reported difficulty in obtaining medical information from Preator. The authorization letter informed Dr. Preator that in completing the required forms, he should indicate a specific period of disability—"unknown" would be insufficient for payment of benefits. Authorization for Dr. Rosenbaum was requested again on May 19, 1981. Ms. Reichard's New Mexico attorney informed the

---

4. *See* footnote 3, *supra,* and accompanying text.

commissioner that his client preferred the more conservative treatment of Dr. Rosenbaum, who opposed the surgery recommended by Dr. Preator. Dr. Rosenbaum reported on June 25, 1981, that Ms. Reichard remained "totally disabled for gainful employment." On July 3, 1981, authorization to Dr. Rosenbaum was denied on the ground that Reichard was being referred to Dr. Barnham "for his recommendations of disability to that caused by the injury and superimposed on the preexisting condition namely obesity."

Dr. Barnham reported his findings on November 9, 1981, as follows: "[S]he has quite swollen knees ... marked crepitus and winces with pain when the patella is moved ... some marked degree of degenerative arthritis." He believed that Reichard had reached maximum degree of improvement, foreseeing deterioration of her condition, and he further stated that Reichard was 100% disabled. In Barnham's opinion, Reichard might be able to perform a maximum of a half day's work at a sedentary job. He recommended that she use a cane or two for walking, and that she avoid climbing, prolonged standing, and carrying or lifting of heavy objects. Finally, he concurred with Dr. Rosenbaum's diagnosis and treatment: "[G]outy arthritis ... is probably the ultimate cause of her problems and has been exacerbated by the injury and has made her symptomatic." On December 15, 1981, Ms. Reichard's attorney forwarded Dr. Barnham's report to the commissioner and noted in a cover letter that all doctors were in agreement that Reichard was totally disabled. A request was made for advice on what additional information was needed in order to obtain past due compensation. It appears from the record that no response to this request was ever received.

On January 18, 1982, the commissioner referred Reichard to Dr. Pushkin of Charleston, West Virginia, for a permanent partial disability evaluation. On February 1, 1982, Reichard's attorney in West Virginia informed the commissioner that he advised his client not to appear for examination by Dr. Pushkin. Counsel felt that travel to West Virginia would be an unrea-

sonable burden, and that Dr. Barnham, an orthopedic surgeon to whom the commissioner had made a referral, had already found Reichard to be totally disabled.

On February 3, 1982, Dr. Barnham was again contacted by the commissioner, and was asked for his "opinion regarding treatment, maximum degree of improvement, and permanent partial disability in accordance with the American Medical Association Guide to whole man impairment in relation to the compensable injury." In his response, dated March 29, 1982, Dr. Barnham restated his belief that Reichard was totally and permanently disabled. He found problems with both legs: "I believe it is conceivable that she could have damaged one knee and then over-stressed the other to the point that it has degenerative changes in it."

On June 28, 1982, Reichard's current attorney made a written request to the commissioner for action on his client's claim, since there had been no ruling or order for approximately one year and Ms. Reichard faced serious financial hardship due to her disability and lack of income. Counsel notified the commissioner that if no order were entered by July 12, 1982, he would seek a writ of mandamus. On August 16, 1982, Reichard's attorney filed a petition for a writ of mandamus in the Circuit Court of Kanawha County to compel the commissioner to enter an order rating Reichard's permanent disability. A rule to show cause was issued August 18, 1982, returnable on August 31, 1982. There is no indication in the record before this Court of the disposition of the mandamus proceeding below.

Also on August 16, 1982, a medical claims specialist of the commissioner's claims management division forwarded Dr. Barnham's March report to Dr. Rosenbaum and asked Rosenbaum for a detailed medical report. Dr. Rosenbaum responded on August 23, 1981, stating that he did not know Ms. Reichard's current condition because the commissioner had refused to authorize him to continue treatment. He had not seen Reichard since May 7, 1981. However, he estimated that the period of dis-

ability resulting from the knee injury would be approximately two years.

On August 24, 1982, the claim was reopened on a TTD basis. This action was taken in response to the petition for reopening which had been filed on May 29, 1981. On August 26, 1982, an order was entered granting Ms. Reichard TTD benefits from October 28, 1981 to, but not including, March 29, 1982. The order contained a notice that benefits would be suspended if no medical evidence was submitted prior to the last pay date, and that there would be a 60 day suspension period in which to submit additional medical evidence. The order also stated that TTD benefits would be suspended on the date of the order and the claim would be closed on October 28, 1982. On September 10, 1982, another order was entered, awarding TTD benefits from June 18, 1980 to, but not including, July 16, 1981. Again Ms. Reichard was notified of the suspension of benefits as of the last pay date, but she was also notified that benefits would be suspended on the date of the order and that the claim would be closed on November 13, 1982.

On September 16, 1982, the commissioner entered an order granting Reichard a 10% PPD award. The commissioner noted that Reichard "by counsel, has refused to report to a physician duly appointed by the commissioner to perform an independent medical examination as [the commissioner's] advising physician ...." The 10% award was based on *The Manual for Orthopedic Surgeons in Evaluating Permanent Physical Impairment* published by the American Academy of Orthopedic Surgeons. The commissioner found that any disability greater than 10% did not arise from, nor was aggravated by, the compensable injury.

Reichard, by counsel, protested the PPD award on September 20, 1982. This protest was acknowledged on October 6, 1982. Counsel was notified that a hearing would be scheduled. On October 28, 1982, by order of the commissioner, the TTD claim was closed. This order was protested on November 8, 1982, and counsel was notified

on November 19, 1982, that a hearing would be scheduled.

A combined hearing on both protests was held in Charleston, West Virginia on December 16, 1982. Medical reports and correspondence were submitted at that time. Counsel noted that reports in the file showed that Reichard had not reached her maximum degree of improvement, that knee surgery was necessary, and that she would be temporarily disabled for a three-month period beginning October 8, 1982. At the close of the hearing, both protests were submitted for decision. On February 16, 1983, the commissioner affirmed her prior rulings granting 10% PPD and closing the TTD claim. An appeal was taken to the Workers' Compensation Appeal Board on February 18, 1983.

### III.

### MANNING CLAIM

Gerald R. Manning suffered a severe head injury on November 15, 1978, as a result of an automobile accident on the West Virginia Turnpike. At the time of the accident, he was employed by Miami Valley Contractors, Inc. of Dayton, Ohio, and was travelling in a company-owned pickup truck on company time, between two job sites. The pickup was struck head-on by a stolen car. Physicians' reports indicate that Manning sustained a concussion in the accident. His condition was diagnosed as "left hemiparesis secondary to cerebral contusion."

Manning's claim was ruled compensable on December 22, 1978, and TTD benefits were paid from the date of the injury until May 12, 1979. Manning returned to work on June 11, 1979, but was unable to continue working after June 25, 1979. On December 6, 1979, the commissioner granted TTD benefits for the period October 23, 1979 to February 6, 1980. The claim was closed on February 14, 1980.

In the original petition filed with this Court, Manning asserted that he had received no TTD benefits from the date of the injury until October 23, 1979. It appears from respondent's answer and peti-

tioner's reply brief that benefits for much of that time were in fact paid. The transcript of a July 31, 1981 hearing shows that Manning testified that he received TTD benefits from the date of the injury up to February of 1980. Whether payments were made for the period from June 25 to October 23, 1979 remains in dispute. Manning claims that he has not received TTD benefits for the period, and the commissioner claims that the benefits have been paid. Sufficient evidence to resolve this factual dispute has not been presented to us. However, we take the commissioner's assertion that benefits for the period in question have been paid as an admission that Manning was entitled to such benefits.

On October 7, 1980, the commissioner granted Manning a 30% PPD award. The award was based on a report of Dr. Lobo of Huntington, West Virginia, to whom Manning was referred by the commissioner. Dr. Lobo concluded that "the patient's condition has reached a plateau, and it appears to me that he is entitled to a 30% permanent partial disability of the body as a whole as far as the head injury is concerned." There is no evidence on the record before this Court of a timely objection to the PPD award. However, there is further evidence concerning the extent of Manning's disability. A medical report was submitted on October 31, 1980, which showed a deterioration of Manning's condition.

Manning's employer wrote to the commissioner on February 25, 1981, to protest the 30% PPD award. The employer contended that Manning was 100% permanently disabled as a result of his injury, that he was incapable of functioning in his job as superintendent, that his injury diminished his mental capacity to the point where his judgment was impaired, and that the residual phsyical effects (paralysis, epilepsy) created safety problems and made it impossible for Manning to operate tools and train new employees.

On April 27, 1981, Manning's counsel received a letter from the commissioner's senior counsel, informing him that the commissioner had denied a motion made at a

December 23, 1980 hearing to set aside the February 14, 1980 order which closed the TTD claim. Reference was made to the 30% PPD recommendation of Dr. Lobo, and the subsequent 30% PPD award. The letter closed with a notice that "[t]he claim will be rescheduled for additional hearing to give you an opportunity to offer medical evidence."

On July 23, 1981, a hearing was held in Charleston, apparently related to the protest of the February 14, 1980 order closing the TTD claim. Testimony by Manning and his wife, in addition to medical evidence showing a continuous course of treatment for dizziness and convulsive seizures, was submitted. At the close of the hearing, counsel moved for payment of TTD benefits for a period of time in 1980 when Manning was unable to work. This motion was granted on February 19, 1982, and on February 24, 1982, the commissioner ordered that benefits be paid for the periods from February 14 to February 28, 1980, and from August 15 to October 7, 1980.

At the hearing counsel also requested that the commissioner grant a permanent total disability award. Although the claim was submitted for decision, respondent did not rule on the motion with respect to permanent disability. Additional medical evidence was subsequently submitted by the claimant. A psychological report, dated November 9, 1981, concludes "that the lack of coordination, balance, and loss of memory, plus seizures would render Mr. Manning unable to perform his previous work .... Important to note that Mr. Manning's automobile accident has resulted in a significant brain dysfunctioning, resulting in poor integration of movements and thoughts, making him a poor risk for work." A report from Manning's treating physician on April 16, 1982 indicated that his disability was permanent. Medication and psychotherapy were recommended.

The TTD claim, which had been reopened for the limited purpose of paying benefits back to 1980, was closed by order of the commissioner on April 28, 1982. Manning's counsel protested on April 30, 1982

and requested a hearing "at your earliest convenience." Counsel was notified of the right "to a hearing which shall be held at a time and place later to be fixed." Counsel wrote a second letter of protest on May 24, 1982, contending that numerous medical reports had been submitted showing that Manning was unable to work and therefore entitled to benefits.

Meanwhile, Manning had been referred for a psychiatric evaluation. On May 3, 1982, Dr. Weise reported that there was an injury-related psychiatric impairment and that Manning had reached maximum improvement. The doctor recommended a 10% "partial-permanent psychiatric impairment." On May 26, 1982, the commissioner granted a 10% award for permanent partial psychiatric disability, based on Dr. Weise's recommendation. This award was in addition to the 30% PPD already granted for physical disability. On June 1, 1982, Manning, by counsel, objected to the combined PPD award, noting the pendency of the petition to reopen the claim and reinstate TTD benefits.

The most recent hearing in this claim was held on June 14, 1982, where counsel contended that Manning was entitled to TTD benefits for a longer period than granted in the February 24, 1982 order. Counsel also reiterated the objection to the April 28, 1982 order which closed the claim on a TTD basis. Finally, it was argued that the evidence supported a permanent total disability award. The claim was then "submitted for a prompt final ruling." On October 14, 1982, counsel wrote to the commissioner, requesting a ruling on his objections.

A letter from the commissioner to Manning's counsel, dated November 23, 1982, acknowledged receipt of the protests to the April 28 and May 26, 1982 orders, and,

despite the fact that a hearing had been held June 14, 1982, further notified him that "a hearing ... shall be held at a time and place to be later fixed." By order of the commissioner, dated February 7, 1983, the orders of February 24 (granting TTD benefits retroactive to 1980), April 28 (reclosing the TTD claim), and May 26 (granting a PPD award) were all affirmed. The February 7 order was appealed on February 11, 1983, and the matter is now before the Workers' Compensation Appeal Board.

## IV.

■ Our criteria for entitlement to relief through mandamus are well established. Before this Court may properly issue a writ of mandamus three elements must coexist: (1) the existence of a clear right in the petitioner to the relief sought; (2) the existence of a legal duty on the part of the respondent to do the thing the petitioner seeks to compel; and (3) the absence of another adequate remedy at law.

Syllabus Point 3, *Cooper v. Gwinn*, 171 W.Va. 245, 298 S.E.2d 781 (1981). *See also Smith v. West Virginia State Bd. of Ed.*, 170 W.Va. 593, 295 S.E.2d 680 (1982); *United Mine Workers of America v. Miller*, 170 W.Va. 177, 291 S.E.2d 673 (1982); *Perry v. Barker*, 169 W.Va. 531, 289 S.E.2d 423 (1982); *State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969).

In this case the relief sought by the petitioners is threefold. First, they seek to compel the commissioner to comply with time limitations contained in W.Va.Code §§ 23–4–1c, 23–4–16 and 23–5–1, and to promulgate rules and regulations as contemplated by W.Va.Code 23–1–13.[5] Second, they seek to compel the commissioner to pay temporary total disability (TTD) ben-

---

5. The petitioners further request that the commissioner be compelled to create an advisory body to draft regulations contemplated by W.Va.Code §§ 23–1–13 and 23–4–7a (1981 Replacement Vol.). We note that the Legislature has already created "the workers' compensation advisory board," which, although not a party to this proceeding, has the duty "to advise the workers' compensation commissioner on matters pertinent to the administration of the work-

ers' compensation fund." W.Va.Code § 23–1–18 (Cum.Supp.1983). However, the advisory board's recommendations are not binding on the commissioner. Thus, the responsibility for complying with the statutory requirements of the Act lies first with the commissioner, and, ultimately, with the governor, who as the State's chief executive officer has the constitutional duty to "take care that the laws be faithfully executed." W.Va. Const. art. VII, § 5.

efits and to raise permanent partial disability (PPD) awards to become permanent total disability awards. Finally, the petitioners seek reimbursement from the commissioner for costs and request an award of reasonable attorney fees.[6]

■ The commissioner contends that the petitioners are not eligible to relief in mandamus because this proceeding is an attempt to circumvent the "adversarial" hearing and appeal process below. Specifically, the commissioner contends that the petitioners' complaints are moot "because of their posture in the hearing or appeal stage."

■ We do not believe that the procedural posture of the petitioners' claims below renders moot the issues raised here. We note in this regard that, at the time of the filing of the petition herein, Meadows' claim for TTD benefits remained before the commissioner awaiting adjudication. While Reichard's and Manning's claims are before the Workers' Compensation Appeal Board, W.Va.Code § 23–5–3 (1981 Replacement Vol.) authorizes the board to remand cases to the commissioner for supplemental hearings. Thus, the matters raised by the petitioners are clearly capable of repetition below. Moreover, the failure of the commissioner to comply with statutory time requirements is not an issue which can adequately be addressed at the appeal board level. "While it is true that mandamus is not available where another specific and adequate remedy exists, if such other remedy is not equally as beneficial, convenient, and effective, mandamus will lie." Syllabus Point 4, *Cooper v. Gwinn, supra.* *See Snyder v. Callaghan,* 168 W.Va. 265, 284

S.E.2d 241 (1981); *State ex rel. Lemley v. Roberts,* 164 W.Va. 457, 260 S.E.2d 850 (1979); *Walls v. Miller,* 162 W.Va. 563, 251 S.E.2d 491 (1979); *State ex rel. Smoleski v. County Court,* 153 W.Va. 307, 168 S.E.2d 521 (1969); *State ex rel. Bronaugh v. City of Parkersburg,* 148 W.Va. 568, 136 S.E.2d 783 (1964). *See also State ex rel. White v. Narick,* 170 W.Va. 195, 292 S.E.2d 54 (1982); *Rissler v. Giardina,* 169 W.Va. 558, 289 S.E.2d 180 (1982).

■ The commissioner's characterization of workers' compensation proceedings as "adversarial" is not consistent with the purpose of the West Virginia Workers' Compensation Act, nor the facts of this case. No employer protests were lodged in connection with the three claims before us here. Under our statutes, the commissioner's role is that of a referee only when disputes arise between contestants. Otherwise, the commissioner serves in an administrative fact-finding capacity that is not bound by the traditional rules operative in an adversary system.[7] The Act is designed to compensate injured workers as speedily and expeditiously as possible in order that injured workers and those who depend upon them for support shall not be left destitute during a period of disability. The benefits of this system accrue both to the employer, who is relieved from common-law tort liability for negligently inflicted injuries, and to the employee, who is assured prompt payment of benefits.

In his respected treatise, Professor Larson addresses the underlying social philosophy of workers' compensation systems.

The ultimate social philosophy behind the compensation liability is belief in the

---

6. The petitioners also request that the Court "take such action as [it] deems necessary to assure that counsel of record receives copies of correspondence and orders sent to or from [the commissioner]." The commissioner does not address this request in her answer or note of argument. However, in the "Claims Summary" for petitioner Manning, the commissioner does admit that "we are still wrestling with the problem of how to get copies of computer generated orders to parties of the claim other than the employer and the claimant." We agree with the petitioners that the failure to provide copies of orders and other correspondence to counsel of record can have substantial adverse effects on

claimants' rights, and could, in the proper circumstances, constitute an effective denial of due process. It appears from the record that the commissioner recognizes this problem, is taking steps to correct it, and that counsel for the petitioners has been provided with recent orders and correspondence involving the claimants. Accordingly, we do not further address this request for relief.

7. The commissioner is given authority by W.Va. Code § 23–1–13 to promulgate special rules of procedure and evidence to govern the administrative process.

wisdom of providing, *in the most efficient, most dignified, and most certain form,* financial and medical benefits for the victims of work-connected injuries which an enlightened community would feel obliged to provide in any case in some less satisfactory form, and of allocating the burden of these payments to the most appropriate source of payment, the consumer of the product.

A. Larson, *Workmen's Compensation* § 2.20 (Desk Ed.1980) (emphasis added).

This philosophy finds substance in our statutes establishing the West Virginia state workers' compensation system. For example, W.Va.Code § 23-5-3a (1981 Replacement Vol.) provides that it is the policy of our law that:

The rights of claimants for [workers'] compensation be determined as speedily and expeditiously as possible to the end that those incapacitated by injuries and the dependents of deceased [workers] may receive benefits as quickly as possible in view of the severe economic hardships which immediately befall the families of injured or deceased [workers].

Moreover, W.Va.Code § 23-4-7 (1981 Replacement Vol.) specifically declares that a "primary objective of the [workers'] compensation system established by this chapter [is] to provide benefits to an injured claimant promptly."

■ Accordingly, we have consistently held in the past that one of the primary objectives of the Legislature in establishing the workers' compensation system is to provide prompt and fair compensation to injured workers, and that "[l]ong delays in processing claims for [workers'] compensation is not consistent with the declared policy of the Legislature to determine the rights of claimants as speedily and expedi-

tiously as possible." Syllabus Point 1, *Workman v. State Workmen's Compensation Comm'r,* 160 W.Va. 656, 236 S.E.2d 236 (1977). *See also Mitchell v. State Workmen's Compensation Comm'r,* 163 W.Va. 107, 256 S.E.2d 1 (1979). *State ex rel. Conley v. Pennybacker,* 131 W.Va. 442, 48 S.E.2d 9 (1948); *Poccardi v. Ott,* 82 W.Va. 497, 96 S.E. 790 (1918).

It cannot be disputed that the petitioners, all workers injured in the course of and resulting from employment, have a constitutional right to the benefit of the statutes establishing our system of workers' compensation. As we stated in *Cooper v. Gwinn,* 171 W.Va. 245, 298 S.E.2d 781, 786 (1981):

By terms of our organic law the people are entitled to the benefit of law enacted by their legislative representatives. The responsibility to see that the law enacted by the people is enforced rests primarily upon the executive department. When, however, the executive department fails to expedite the will of the people as expressed by the Legislature, the people may petition the courts by way of extraordinary proceedings such as mandamus ... to require the executive branch to comply with the law enacted by the Legislature.

■ The respondent State Workers' Compensation Commissioner is the executive officer charged with the faithful execution of the workers' compensation statutes enacted by the Legislature. *See* W.Va. Code § 23-1-1 (Cum.Supp.1983). Included among the commissioner's statutory duties are the requirements of W.Va.Code §§ 23-4-1c, 23-1-13, 23-4-16, and 23-5-1, which provide that the commissioner shall act within certain specified periods of time with respect to the processing of claims.[8]

**8.** Originally, W.Va.Code § 23-4-1c contained no specific provision regarding time requirements. 1973 W.Va. Acts ch. 141. One year after its adoption, however, the Legislature amended the statute to include the current 15 day limitation on compensability determinations. 1974 W.Va. Acts ch. 145. Similarly, the 30 day adjustment determination requirement now found in W.Va. Code § 23-4-16 is of fairly recent origin. In 1935, the Legislature added a 90 day requirement limiting the period within which the commissioner is to decide applications for claim

adjustment. 1935 W.Va.Acts ch. 78. Four years later, the Legislature further reduced this period for adjustment determinations to the present 30 days. 1939 W.Va.Acts ch. 137. Concern with administrative delay has also evidenced itself in the legislative history of W.Va.Code § 23-5-1. Until 1935, there were no time restrictions on the commissioner (1) with regard to setting a time and place for the hearing of evidence on objections to commissioner decisions; (2) with regard to the time within which hearings must

These statutes speak in mandatory language that precludes the exercise of discretion on the part of the commissioner. It is well established that mandamus will lie to compel the workers' compensation commissioner to perform nondiscretionary statutory duties. *See, e.g., Wilson v. Lewis,* 166 W.Va. 273, 273 S.E.2d 96 (1980); *Wnek v. Blizzard,* 163 W.Va. 489, 256 S.E.2d 772 (1979); *State ex rel. Garnes v. Hanley,* 150 W.Va. 468, 147 S.E.2d 284 (1966); *State ex rel. Island Creek Coal Co. v. Hanley,* 149 W.Va. 107, 138 S.E.2d 848 (1964); *State ex rel. Myers v. Straughan,* 144 W.Va. 452, 108 S.E.2d 565 (1959).

## V.

The petitioners' first complaint focuses on the statutes which impose time limits within which the commissioner must act when processing workers' compensation claims. The petitioners complain that the commissioner fails to act within the statutory time limits. Second, they contend that the commissioner has failed to promulgate rules and regulations which reflect the time limits prescribed by statute.

The relevant statutes are W.Va.Code §§ 23–4–1c, 23–4–16, and 23–5–1. These statutes govern the initial processing of claims as well as determining the merits of petitions to reopen or otherwise adjust claims, scheduling dates for hearings on objections and rendering final decisions.[9]

The procedural history of these claims is a tangled web of benefit payments, claim closures, objections by the claimants, petitions to reopen closed claims, medical re-

ports and "final" decisions by the commissioner. The prevalent theme, however, which emerges from a review of the procedures employed in these claims has been the commissioner's rudimentary failure to meet the statutorily prescribed time limits. If we desired, we could cite example after example demonstrating the commissioner's failure to obey the law. For the sake of brevity, however, we cite one example per statute to illustrate that the commissioner frequently fails to act as required by statute.

W.Va.Code § 23–4–1c, *inter alia,* authorizes the commissioner to "immediately commence payment of temporary total disability benefits" when the employer's report shows that the employee's injury will last more than three days. Alternatively, the commissioner "shall commence such payment [of TTD benefits] within 15 days of receipt of the employee's or employer's report of injury, whichever is received sooner, and receipt of either a proper physician's report or any other information necessary for a determination."

Petitioner Meadows' claim demonstrates the commissioner's failure to adhere to this schedule. Meadows filed his claim November 10, 1977, and his employer filed an injury report the next day. The commissioner could have exercised her discretion and awarded TTD benefits at this point, but chose not to do so. The commissioner received a physician's report November 28, 1977. Upon receipt of this report, the commissioner had until December 12, 1977, to act (15 days after receipt of the physician's

---

be held on objections to commissioner decisions; and, (3) with regard to the period of time within which the commissioner must make a determination after final hearing on objections to commissioner decisions. In 1935, the Legislature enacted a 30 day requirement within which the commissioner must set a time and place for the hearing of evidence on objections to commissioner decisions. 1935 W.Va.Acts ch. 78. In 1973, the Legislature reduced this period to 15 days. 1973 W.Va.Acts ch. 141. In 1937, a provision was added to the act requiring that hearings be held on objections to commissioner decisions within 60 days after the filing of objections. 1937 W.Va.Acts. ch. 104. In 1973, the Legislature reduced this period to 30 days. 1973 W.Va. Acts ch. 141. In 1935, a 60 day time

requirement was enacted within which the commissioner must render his or her decision after a hearing on objections. 1935 W.Va.Acts ch. 78. In 1971, the Legislature reduced this period to 45 days. 1971 W.Va.Acts ch. 177. Then, in 1973, the Legislature reduced this period even further to 30 days. 1973 W.Va.Acts ch. 141. The history of these statutory time limitations clearly demonstrates a growing legislative concern with the expeditious handling of injured workers' claims. This constriction of administrative discretion has been necessary to ensure that the benevolent purposes of our workers' compensation system are adequately served.

**9.** *See* footnote 1, *supra.*

report). However, the commissioner did not rule upon the claim until February 4, 1978, 54 days after the statutory deadline and 85 days after the commissioner received the employer's report. It is obvious that the commissioner failed to meet the 15-day time limit mandated by W.Va.Code § 23-4-1c.

A claimant is allowed 30 days to file an objection to an order of the commissioner. Pursuant to W.Va.Code § 23-5-1, once an objection is filed, the commissioner is given 15 days to set a time and place for a hearing on the objection. Generally, the hearing must be held within 30 days after the filing of the objection, unless the parties agree to postpone the hearing or it is postponed by the commissioner for good cause shown. After the hearing, the commissioner must issue a final decision within 30 days. Thus, if the maximum time period is used for each action, the commissioner, in the absence of a continuance, should rule on objections within 90 days of the filing of the order protested.

On April 28, 1982, the commissioner closed petitioner Manning's TTD claim. Manning's counsel filed an objection two days later. The commissioner then had until May 15, 1982, to set a time and place for a hearing on the objection. Although the commissioner informed Manning of his right to a hearing, she failed to specify the time and place. Manning renewed his objection May 24, 1982. The commissioner finally conducted the hearing on June 14, 1982, two weeks past the 30-day time limit prescribed by W.Va.Code § 23-5-1.

The commissioner then had 30 days to render a decision on Manning's objection. The commissioner once again failed to act, and on October 14, 1982, Manning's counsel requested a ruling by the commissioner. A decision was eventually issued on February 7, 1983, more than six months after the expiration of the 30-day decision period. Thus, it is clear that the commissioner failed to observe the time limits set forth in W.Va.Code § 23-5-1, even though this failure to act was brought to the commissioner's attention.

Likewise, the commissioner failed to act promptly on petitions to reopen closed claims. W.Va.Code § 23-4-16 states that the "Commissioner shall pass upon and determine the merits of such application [for adjustment] within thirty days after the filing thereof." Petitioner Reichard filed a petition to reopen her claim May 29, 1980, after the commissioner closed the claim for lack of a physician's report. The commissioner did not even *acknowledge* the petition until October 22, 1980, almost four months after the 30-day time limit had expired. The commissioner awarded TTD benefits February 19, 1981, presumably after reopening the claim. Thus, a process which is designed to take no more than 30 days took almost nine months to complete.

The commissioner admits that she "does not always comply with the time provisions [dictated by statute]." The commissioner's defense to this failure is that "it is impossible to consistently do so, considering the availability of funds, personnel, and space ... limitations." This is no excuse for the failure of the commissioner to faithfully execute the duties of her office. The Workers' Compensation Act authorizes the commissioner to employ sufficient staff to administer the workers' compensation system, *see* W.Va.Code § 23-1-6 (1981 Replacement Vol.), and to pay their salaries and "[a]ll expenses peculiar to the administration of [the system]," out of the workers' compensation fund. W.Va.Code § 23-1-2 (1981 Replacement Vol.). Accordingly, any deficiencies in this regard are a failure of management attributable to the commissioner's failure to staff the agency in the manner necessary to administer the system created by the Legislature.

■ The time limits found in W.Va.Code §§ 23-4-1c, 23-4-16, and 23-5-1 all contain the word "shall." We have repeatedly held that, "use of the word 'shall,' in the absence of language in the statute showing a contrary intent on the part of the Legislature, should be afforded a mandatory connotation." *Cooper v. Gwinn,* 171 W.Va. 245, 298 S.E.2d 781, 789-90 (1981) (cases cited). Therefore, we conclude that the commissioner must act on workers' com-

pensation claims within the statutorily prescribed time limits found in W.Va.Code §§ 23-4-1c, 23-4-16 and 23-5-1.[10]

Additionally, the petitioners allege that the commissioner has failed to comply with W.Va.Code § 23-1-13 (1981 Replacement Vol.). That statute directs that the commissioner "shall adopt reasonable and proper rules of procedure ... and prescribe the time within which adjudications and awards shall be made."

■ The petitioners contend that the commissioner has failed to promulgate rules and regulations governing "the time within which adjudications and awards shall be made" as required by W.Va.Code § 23-1-13. A review of the regulations promulgated by the commissioner [11] reveals a clear failure to specify specific time limits. The commissioner contends that the promulgation of regulations specific time periods would be surplusage in light of the time requirements set forth in W.Va.Code §§ 23-4-1c, 23-4-16, and 23-5-1. We do not read W.Va.Code § 23-1-13 as requiring such a redundant act. Rather, we read the statute, *inter alia*, as existing in aid of the temporal requirements found elsewhere within the Worker's Compensation Act. Consequently, W.Va.Code § 23-1-13 should be read as the Legislature's direction to the commissioner to establish by regulations time frames for internal procedures by which the mandatory time limits contained in W.Va.Code §§ 23-4-1c, 23-4-16, and 23-5-1 may be met. Any other interpretation of the statute would contradict the duty of this Court to avoid whenever possible a construction of a statute that leads to absurd, inconsistent, unjust, or unreasonable results. *See State ex rel. Simpkins v. Harvey*, 172 W.Va. 312, 305 S.E.2d 268 (1983) (cases cited). Accordingly, we conclude that the commissioner is required by W.Va.Code § 23-1-13 to promulgate regulations specifying, *inter alia*, internal procedural time limits through which adjudications and awards are made.

## VI.

### TTD AWARDS

■ Each of the claimants seeks payment of TTD benefits for specific periods. A review of the record before this Court, however, indicates that the claimants have not established the clear right to TTD benefits necessary for relief in mandamus.

### A.

Meadows seeks TTD benefits for three specific periods: (1) from September 11, 1979 to February 17, 1980; (2) from March 28, 1980 to May 21, 1980; and (3) from February 5, 1981 to December 22, 1981. We do not address Meadows' entitlement for the first period because no objection was made below to the commissioner's order which awarded benefits commencing February 18, 1980. It appears from the record that Meadows did, in fact, receive TTD benefits for the second of the three periods. The commissioner contends that benefits have been paid from February 18, 1980. Although Meadows asserts that TTD benefits were not paid from March 28 to May 21, 1980, this assertion is contradicted by a letter, dated July 21, 1980, from Meadows' counsel to the commissioner, stating that benefits had been received through May of 1980. We are unable to make a determination with respect to the third period for which Meadows seeks TTD benefits as a result of the incompleteness of the record before the court.[12]

---

**10.** We wish to make clear that we are here concerned only with the time limitations placed upon the commissioner by W.Va.Code §§ 23-4-1c, 23-4-16, and 23-5-1, and not time limitations placed upon claimants and employers which are not before us. *See Bailey v. State Workmen's Compensation Comm'r*, 170 W.Va. 771, 296 S.E.2d 901 (1982).

**11.** The petitioners allege that the commissioner has failed to issue or update regulations since they were issued effective January 5, 1976. The

commissioner contends that she "clarified" the regulations with the Secretary of State. However, these regulations still bear on effective date of January 5, 1976. The "clarification" made by the commissioner apparently consisted of deleting regulations first issued in 1976.

**12.** The record does not contain a copy of the commissioner's order of January 14, 1981, which awarded Meadows TTD benefits from January 6 through February 4, 1981. Accordingly, we are unable to determine whether such

**B.**

Reichard seeks TTD benefits for the period of March 29, 1982 to October 28, 1982. The claimant was granted a PPD award on September 16, 1982, and is not entitled to TTD benefits following this date. *See* W.Va.Code § 23–4–7a(c) (1981 Replacement Vol.). She may, however, be entitled to TTD benefits for some or all of the period from March 29 to the entry of the order granting the PPD award. Although it appears from the record that the commissioner may have arbitrarily chosen March 29, 1982 as the cut-off date for TTD benefits,[13] we are unable to ascertain from the record the proper date for the termination of benefits. This question is currently before the Workers' Compensation Appeal Board and we therefore express no opinion on the issue. The appeal board will benefit from an examination of the entire record of Reichard's claim, which we do not have before us. Accordingly, we decline to invade the appeal process. It is important to note, however, that the appeal board is subject to certain statutory time limitations similar to those imposed upon the commissioner. The board must meet monthly for "as long as may be necessary for the proper and expeditious transaction of the hearings, decisions and other business before it." W.Va.Code § 23–5–2. The board is also subject to the statutory requirement that "the rights of claimants for [workers'] compensation be determined as speedily and expeditiously as possible . . . ." W.Va. Code § 23–5–3a. In a proper case, mandamus would lie to compel a prompt determination by the board of the merits of a claim before it for consideration. Given the length of time Reichard's case has been before the appeal board, it should be ma-

ture for appeal to this Court if she is not satisfied with the disposition below.

**C.**

Manning seeks TTD benefits from June 25 to October 23, 1979, and from October 7, 1980 to April 28, 1982. There is no dispute that the claimant is entitled to benefits for the first period from June 25 to October 23, 1979. However, a controversy exists as to whether Manning did, in fact, receive benefits for this period of disability. We are unable to resolve this dispute upon the record before us. The commissioner granted Manning a PPD award on October 7, 1980, and he therefore is not entitled to the payment of TTD benefits beyond that date. *See* W.Va.Code § 23–4–7a(c).

**VII.**

**PPD AWARDS**

Claimants Reichard and Manning both challenge their PPD awards, alleging that they are permanently and totally disabled, and are therefore entitled to permanent total disability (PTD) awards.

**A.**

■ The commissioner granted Reichard a 10% PPD award based on the Manual for Orthopedic Surgeons. In granting the award, the commissioner relied on the manual to compute Reichard's percentage of disability because the claimant had refused to travel to West Virginia from New Mexico for an independent medical examination. Although we find the commissioner's reliance upon the manual to be questionable,[14] we note that there remains a *bona*

---

order constituted sufficient advance notice of termination of benefits pursuant to *Mitchell v. State Workmen's Compensation Commissioner,* 163 W.Va. 107, 256 S.E.2d 1 (1979), as applied in *Honaker v. State Workmen's Compensation Commissioner,* 171 W.Va. 355, 298 S.E.2d 893 (1982). Although it appears from the limited record we have before us that the commissioner's order of December 22, 1981, which closed Meadows' claim, may have been arbitrary and an abuse of discretion, this matter is currently at the hearing stage below, where a full factual development of the issues can be made, and a decision rendered thereon.

**13.** March 29, 1982 is the date of Dr. Barnham's report which stated that Reichard was permanently and totally disabled. However, Dr. Barnham also reported that Reichard might benefit from surgery, which indicates that the claimant had not reached her maximum degree of improvement.

**14.** When the claimant received notice that she was to be examined by Dr. Pushkin in Huntington, her lawyer notified the commissioner that he was advising Reichard not to appear. The commissioner then referred Reichard to Dr.

*fide* dispute concerning the extent of the claimant's permanent disability attributable to her compensable injury. Again, this issue is currently before the appeal board, which has the duty to determine the merits of the appeal as speedily and expeditiously as possible. It has not been shown that review by the board constitutes an inadequate remedy. Accordingly we decline relief in mandamus on this issue.

## B.

■ Manning was granted a 30% PPD award for physical disability on October 7, 1980. A further 10% PPD award for psychiatric disability was granted on May 26, 1982. It is apparent on the record that this combined 40% PPD award is inadequate compensation for this claimant's permanent disability attributable to his head injury. The undisputed evidence indicates that Manning suffers continued convulsive seizures, loss of balance, dizziness, blackouts, loss of memory, and paralysis. Manning's employer contends that the claimant is permanently and totally disabled and incapable of functioning in his previous work, as is demonstrated by his unsuccessful attempts to return to his job. The Ohio Rehabilitation Services Commission has determined that the claimant cannot be rehabilitated for substantial gainful employment. Indeed, the commissioner concedes that "it would appear that at this point this man is probably permanently and totally disabled." There is no serious dispute as to the nature, cause, and extent of Manning's disability. The evidence indicates that Manning cannot perform his customary work or any type of employment requiring similar skills and abilities. *See* W.Va.Code § 23–4–6(n) (1981 Replacement Vol.); *Cardwell v. State Workmen's Compensation Comm'r*, 171 W.Va. 700, 301 S.E.2d 790 (1983). In view of this evidence, we conclude that Manning has established a clear legal right to a PTD award. We do not believe that review by the appeal board, with its attendant delay, is an adequate remedy for this claimant. Where a claimant clearly shows permanent total disability a proper award should be promptly made. A primary objective of the workers' compensation system established by the Legislature is "to provide benefits to an injured claimant promptly ...." W.Va. Code § 23–4–7. Accordingly, we conclude that Manning is entitled to a PTD award, and we direct the commissioner to enter an appropriate order immediately granting Manning such an award.

## VIII.

■ Finally, the petitioners in this case request an award for court costs and attorney fees. In *Nelson v. Public Employees Insurance Board*, 171 W.Va. 445, 300 S.E.2d 86, 92 (1983), a mandamus proceeding in which the commissioner was a party respondent, this Court held that, "[i]n mandamus proceedings where a public officer willfully fails to obey the law, attorney fees will be awarded." The rationale for the award of attorneys fees in *Nelson*, 171 W.Va. at 451, 300 S.E.2d at 92, applies with equal force in the present case:

> Our statutory law does not contemplate that officers of the executive branch of government, after taking their oath, ... will knowingly disregard their duty to faithfully execute the law.... [T]he constitution explicitly contemplates and mandates that public officers "*shall* perform such duties as may be presented by law." (Emphasis added.) W.Va. Const. art. 7, § 1. Citizens should not have to resort to lawsuits to force government officials to perform their legally prescribed non-discretionary duties. When,

Barnham in New Mexico, and also sought information from Dr. Rosenbaum, the physician who had previously treated the claimant. Nothing in the record before the Court suggests that the commissioner did not acquiesce in the claimant's refusal to travel to West Virginia for examination by Dr. Pushkin—nothing, that is, until the PPD award letter in which the claimant's refusal was cited by the commissioner as a justification for reliance on the Manual for Orthopedic Surgeons rather than on the opinions of qualified physicians to determine the percentage of permanent disability. Moreover, reliance on the manual itself may pose additional questions if provision for its use is not authorized by statute or regulation, giving parties no notice of this practice by the commissioner.

however, resort to such action is necessary to cure willful disregard of law, the government ought to bear the reasonable expense incurred by the citizen in maintaining the action. No individual citizen ought to bear the legal expense incurred in requiring the government to do its job. [citations omitted]

■ Attorneys for the petitioners in this case were forced by bureaucratic indifference to lead their clients on a Kafka-esque journey through a labyrinth of administrative bungling. Petitions were processed and hearings scheduled for matters upon which determinations had already been made, consequently resulting in proceedings at which only the hearing examiner appeared. Claims were periodically opened, closed, reopened, reclosed, etc., for no cognizable reason other than the commissioner's repeated justification of "clerical error." In Meadows' case, one of the two reasons given for termination of TTD benefits at one point was his failure to submit to surgery which had already been performed over two months prior to entry of the termination order. In Reichard's case, the commissioner inexplicably took almost five months to *acknowledge* receipt of a petition to reopen which the commissioner subsequently determined established a *prima facie* case for reopening. It is apparent that the commissioner has acted unlawfully, in utter disregard not only of mandatory duties imposed by law, but also of the plight of injured workers who desperately need the prompt resolution of their claims. We believe the commissioner's clear and systematic failure to abide by statutory mandate satisfies the willfulness requirement imposed by *Nelson*. We therefore hold that the petitioners are entitled to reasonable attorney fees and costs expended in the prosecution of this mandamus proceeding in accordance with the standard set out in *Nelson*. They should submit a detailed bill to the commissioner for the prompt payment of their fees and costs.

The petitioners are also entitled to payment of attorney fees expended for representation rendered below. The conventional thinking regarding attorney fees in compensation cases "is the same as that for any other case: Each party pays his own lawyer, win or lose." 3 A. Larson, *The Law of Workman's Compensation* § 83.11 (1983). The application of this view is complicated in the context of compensation cases and poses special problems. As Larson notes,

When ... this practice is super-imposed upon a closely calculated system of wage-loss benefits, a serious question arises whether the social objectives of the legislation may to some extent be thwarted. The benefit scales are so tailored as to cover only the minimum support of the claimant during disability. There is nothing to indicate that the framers of the benefit rates included any padding to take care of legal and other expenses incurred in obtaining the award.

*Id.*

In response to the failure of compensation systems which make no allowance for the recoupment of attorney fees by prevailing claimants to fulfill the income maintenance objectives of workers' compensation, an increasing number of states have adopted unambiguous statutory provisions which increase a successful claimant's award by an amount sufficient to allow for reasonable attorney fees. *See, e.g.*, Ark. Stat.Ann. § 81–1332 (Supp.1981); Conn. Gen.Stat.Ann. § 31–300 (West Supp.1983); Del.Code Ann. tit. 19, § 2127 (1979); Fla. Stat. § 440.34(3) (1981); Me.Rev.Stat.Ann. tit. 39, § 110 (Supp.1982); Minn.Stat.Ann. § 176.511 (West Supp.1983); Mont.Code Ann. § 39–71–612 (1981); N.J.Rev.Stat. § 34: 15–64 (Supp.1982); N.M.Stat.Ann. § 52–1–54 (1981); Or.Rev.Stat. § 656.382—.388 (1981); 77 Pa.Stat.Ann. § 996 (Purdon Supp.1983); R.I.Gen.Laws § 28–35–32 (Supp.1982).[15] Additionally, in 1972, the Longshoremen's Act joined the growing list of statutes with add-on attor-

---

**15.** In several of the cited states the law requires payment by employers who make "frivolous" or "unreasonable" protests to commissioner determinations in favor of claimants when those claimants ultimately prevail. In the present case, there were no employer protests.

ney fees. P.L. 92–576, § 13, 86 Stat. 1259, *codified at* 33 U.S.C. § 928 (1976 & Supp. V 1981).

■ The West Virginia provision recognizing the need for attorney fees in compensation cases is contained in W.Va.Code § 23–5–5 (1981 Replacement Vol.), which provides:

> [N]o attorney's fees in excess of twenty percent of any award granted shall be charged or received by an attorney for a claimant or dependent. In no case shall the fee received by the attorney of such claimant or dependent be in excess of twenty percent of the benefits to be paid during a period of two hundred eight weeks.

This provision is a limitation on the amount of attorney fees which may be received by an attorney representing a compensation claimant. It does not address *who* shall pay a successful claimant's attorney fees. W.Va.Code § 23–4–6 (1981 Replacement Vol.), however, provides, "where compensation is due an employee under the provisions of this chapter for personal injury, such compensation *shall* be ... provided ...." We have consistently held that workers' compensation statutes are remedial and are to be liberally construed in favor of claimants for workers' compensation benefits. *See, e.g., Zackery v. State Workmen's Compensation Comm'r,* 162 W.Va. 932, 253 S.E.2d 532 (1979); *Workman v. State Workmen's Compensation Comm'r, supra; Dunlap v. State Workmen's Compensation Comm'r,* 160 W.Va. 58, 232 S.E.2d 343 (1977); *Hughes v. State Workmen's Compensation Comm'r,* 156 W.Va. 146, 191 S.E.2d 606 (1972); *Johnson v. State Workmen's Compensation Comm'r,* 155 W.Va. 624, 186 S.E.2d 771 (1972). When we read W.Va.Code §§ 23–5–5 and 23–4–6 together in light of this rule of construction, we find nothing which indicates that workers' benefits should be reduced by the amount of reasonable attorney fees expended in securing their payment.

■ Our compensation law does not contemplate that benefits paid to disabled workers for personal injuries suffered in the course of employment, which are designed to maintain workers and their families during periods of disability, will be reduced by legal costs incurred in securing those benefits to which workers are entitled by law. "[O]ne of the essential purposes of the Workmen's Compensation Act as conceived by the Legislature ... is to provide a simple and expeditious method of resolving the question of disputed claims arising from injuries occurring in the workplace." *Mitchell, supra* 163 W.Va. at 117, 256 S.E.2d at 9. The act is designed to reduce the necessity for legal representation of injured workers. Claimants cannot be penalized by a reduction in their benefits for attorney fees resulting from the failure of the commissioner to comply with statutory duties. Indeed, no better case could be made for an instance in which fee shifting is more appropriate than the present one.

■ The objective of our compensation law "is beneficent and bountiful, its provisions broad and generous. The intention and design of its enactment is to establish a mode for the prompt redress of grievances and secure restitution *commensurate with the loss of the services* of those upon whom depend for support and maintenance the persons named in the statute as its beneficiaries." *Poccardi v. Ott,* 82 W.Va. 497, 501, 96 S.E. 790, 791 (1918) (emphasis added). Accordingly, we conclude that where a claimant for workers' compensation benefits is required to hire an attorney to contest unlawful acts of the commissioner, the claimant should be reimbursed for attorney fees incurred in vindicating his statutory entitlement to benefits. Attorney fees are to be paid by the commissioner who fails to comply with statutory duties. The proper amount of the attorney fee award sought for contested proceedings below should be determined by reference to the factors set out in Disciplinary Rule 2–106 of the Code of Professional Responsibility, *see Nelson v. W. Va. Public Employees Ins. Bd., supra; Farley v. Zapata Coal Corp.,* 167 W.Va. 630, 281 S.E.2d 238 (1981), as limited by the provisions of W.Va.Code § 23–5–5. Counsel should present a detailed statement to the commissioner to facilitate this determination.

Of the three claimants involved in this proceeding, only petitioner Manning has, at this stage, prevailed in his protests to the commissioner's order awarding permanent disability benefits. Accordingly, as contemplated by the Act, the commissioner shall award Manning attorney fees incurred below in connection with the protest of his PPD award. Manning's claim for past TTD benefits, as well as the claims raised by the other two petitioners have yet to be resolved on the merits. Should the petitioners ultimately prevail, however, they will be entitled to an award of reasonable attorney fees from the commissioner.

For the foregoing reasons, we grant a writ of mandamus ordering the respondent: (1) to comply with the temporal provisions of W.Va.Code §§ 23–4–1c, 23–4–16, and 23–5–1; (2) to promulgate rules and regulations prescribing the time limits for internal procedures through which adjudications and awards are made; (3) to immediately enter an order granting petitioner Manning a permanent total disability award; (4) to pay the petitioners' costs and reasonable attorney fees expended in this mandamus proceeding; and (5) to pay petitioner Manning's attorney fees expended below in the protest of his permanent disability award.

Writ granted.